[930 NE2d 233, 904 NYS2d 312]

CAYUGA INDIAN NATION OF NEW YORK, Respondent, v DAVID S. GOULD, as Cayuga County Sheriff, et al., Appellants.

Argued March 25, 2010; decided May 11, 2010

## POINTS OF COUNSEL

*Harris Beach PLLC*, Pittsford (*Philip G. Spellane, Karl J. Sleight, Daniel J. Moore, Russell E. Maines, James P. Nonkes* and *Joan P. Sullivan* of counsel), for appellants. I. The Fourth Department's decision should be reversed because declaratory relief is inappropriate when a "criminal proceeding" arising from the same facts is pending. (*Cooper v Town of Islip*, 56 AD3d 511; *Reed v Littleton*, 275 NY 150; *Matter of State of New York v King*, 36 NY2d 59; *Kelly's Rental v City of New York*, 44 NY2d 700; *Matter of B. T. Prods. v Barr*, 54 AD2d 315, 44 NY2d 226; *Matter of Santangello v People*, 38 NY2d 536; *People v Currier*, 221 AD2d 805; *People v Nelson*, 173 AD2d 205; *Matter of Morgenthau v Erlbaum*, 59 NY2d 143.) II. The Fourth Department's decision should be reversed because the Cayuga Indian Nation's open market purchase of the two convenience store parcels does not ipso facto create a "qualified reservation" under Tax Law § 470 (16) (a). (*Cayuga Indian Nation of N.Y. v Pataki*, 413 F3d 266, 547 US 1128; *Matter of People ex rel. Cayuga Nation of Indians v Commissioners of Land Off.*, 152 App Div 543, 207 NY 42; *Oneida Indian Nation of N.Y. v City of Sherrill, N.Y.*, 145 F Supp 2d 226, 544 US 197; *Department of Fin. of City of N.Y. v New York Tel. Co.*, 262 AD2d 96; *Matter of United Univ. Professions v State of New York*, 36 AD3d 297; *Matter of Campagna v Shaffer*, 73 NY2d 237; *Boreali v Axelrod*, 71 NY2d 1; *Cayuga Indian Nation of N.Y. v Village of Union Springs*, 390 F Supp 2d 203.) III. The Fourth Department's decision should be reversed because the Cayuga Indian Nation's sale of tax-free cigarettes violates Tax Law § 471. (*Department of Taxation & Finance of N. Y. v Milhelm Attea & Bros.*, 512 US 61; *Snyder v Wetzler*, 84 NY2d 941; *United States v Morrison*, 596 F Supp 2d 661; *Day Wholesale, Inc. v State of New York*, 51 AD3d 383; *Samiento v World Yacht Inc.*, 10 NY3d 70; *Appleton Acquisition, LLC v National Hous. Partnership*, 10 NY3d 250; *Doctors Council v New York City Employees' Retirement Sys.*, 71 NY2d 669; *Mescalero Apache Tribe v Jones*, 411 US 145; *United States v Jackson*, 805 F2d 457, 480 US 922; *Matter of Charter Dev. Co., L.L.C. v City of Buffalo*, 6 NY3d 578.)

*Jenner & Block LLP* (*David W. DeBruin*, of the District of Columbia bar, admitted pro hac vice, *Joshua M. Segal, David Z. Moskowitz* and *Matthew E. Price* of counsel) and *French-Alcott*,

*PLLC*, Syracuse (*Daniel J. French* and *Lee Alcott* of counsel), for respondent. I. The current Tax Law does not require stamping of cigarettes sold on a "qualified reservation" for personal consumption. (*Department of Taxation & Finance of N. Y. v Milhelm Attea & Bros.*, 512 US 61; *Moe v Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 US 463; *Matter of Town of Brookhaven v New York State Bd. of Equalization & Assessment*, 88 NY2d 354; *Art Masters Assoc. v United Parcel Serv.*, 77 NY2d 200; *Courtesy Sandwich Shop v Port of N.Y. Auth.*, 12 NY2d 379; *Day Wholesale, Inc. v State of New York*, 51 AD3d 383; *Erie County Water Auth. v Kramer*, 4 AD2d 545, 5 NY2d 954; *Matter of Francois v Dolan*, 95 NY2d 33; *East End Trust Co. v Otten*, 255 NY 283; *Gwynne v Board of Educ.*, 259 NY 191.) II. The Cayuga Indian Nation's stores are located on a "qualified reservation" within the meaning of Tax Law § 470 (16). (*City of Sherrill v Oneida Indian Nation of N. Y.*, 544 US 197; *South Dakota v Yankton Sioux Tribe*, 522 US 329; *Solem v Bartlett*, 465 US 463; *DeCoteau v District County Court for Tenth Judicial Dist.*, 420 US 425; *Mattz v Arnett*, 412 US 481; *Hagen v Utah*, 510 US 399; *Rosebud Sioux Tribe v Kneip*, 430 US 584; *Cayuga Indian Nation of N.Y. v Village of Union Springs*, 317 F Supp 2d 128, 390 F Supp 2d 203; *Cayuga Indian Nation of N.Y. v Pataki*, 413 F3d 266; *County of Oneida v Oneida Indian Nation of N. Y.*, 470 US 226.) III. There is no bar to declaratory relief. (*Kelly's Rental v City of New York*, 44 NY2d 700; *Matter of Beneke v Town of Santa Clara*, 9 AD3d 820; *Ulster Home Care v Vacco*, 255 AD2d 73; *Royal Serv. v Village of Monticello*, 247 AD2d 779; *Sa-Bleu, Inc. v Village of Port Chester*, 42 Misc 2d 360; *New York Foreign Trade Zone Operators, Inc. v State Liq. Auth.*, 285 NY 272; *Bunis v Conway*, 17 AD2d 207; *Dun & Bradstreet, Inc. v City of New York*, 276 NY 198; *Socony-Vacuum Oil Co. v City of New York*, 247 App Div 163, 272 NY 668; *Reed v Littleton*, 275 NY 150.)

*Andrew M. Cuomo, Attorney General*, Albany (*Barbara D. Underwood, Andrew D. Bing* and *Rajit S. Dosanjh* of counsel), for State of New York, amicus curiae. The Cayuga Indian Nation's claim of "qualified reservation" status is barred by laches. (*New York v Shinnecock Indian Nation*, 523 F Supp 2d 185; *Oneida Indian Nation v Oneida County*, 432 F Supp 2d 285; *Oneida Indian Nation of N.Y. v Madison County*, 401 F Supp 2d 219; *Bryan v Itasca County*, 426 US 373; *McClanahan v Arizona Tax Comm'n*, 411 US 164; *Cayuga Indian Nation v Cuomo*, 758 F Supp 107; *Oklahoma Tax Comm'n v Sac & Fox Nation*, 508 US 114; *New Mexico v Mescalero Apache Tribe*, 462 US 324; *City of*

*Sherrill v Oneida Indian Nation of N. Y.*, 544 US 197; *Cayuga Indian Nation of N.Y. v Pataki*, 413 F3d 266.)

*Ignacia S. Moreno, Assistant Attorney General*, Washington, D.C., *Charles R. Scott* and *Kathryn E. Kovacs* for United States of America, amicus curiae. I. The Cayuga reservation remains intact. (*Cayuga Indian Nation of N.Y. v Pataki*, 165 F Supp 2d 266, 413 F3d 266; *County of Oneida v Oneida Indian Nation of N. Y.*, 470 US 226; *City of Sherrill v Oneida Indian Nation of N. Y.*, 544 US 197; *Rosebud Sioux Tribe v Kneip*, 430 US 584; *DeCoteau v District County Court for Tenth Judicial Dist.*, 420 US 425; *Solem v Bartlett*, 465 US 463; *Mattz v Arnett*, 412 US 481; *Matter of Sokolowski*, 205 F3d 532; *Roman v Abrams*, 822 F2d 214; *Cayuga Indian Nation of N.Y. v Village of Union Springs*, 317 F Supp 2d 128, 390 F Supp 2d 203.) II. The Supreme Court's decision in *City of Sherrill v Oneida Indian Nation of N. Y.* (544 US 197 [2005]) and the Second Circuit's decision in *Cayuga Indian Nation of N.Y. v Pataki* (413 F3d 266 [2005]) are irrelevant here.

*Kathleen B. Hogan, District Attorney*, White Plains (*Anthony J. Servino, John J. Carmody* and *Morrie Kleinbart* of counsel), for District Attorneys Association of New York State, amicus curiae. The Fourth Department's ruling that the pendency of a "criminal proceeding" does not preclude a defendant or target of a criminal investigation from seeking declaratory and injunctive relief in a civil forum is contrary to established precedent, violative of public policy and must be reversed. (*Reed v Littleton*, 275 NY 150; *Kelly's Rental v City of New York*, 44 NY2d 700; *Delaney v Flood*, 183 NY 323; *Davis v American Socy. for Prevention of Cruelty to Animals*, 75 NY 362; *Matter of Newsday, Inc.*, 3 NY3d 651; *Matter of B. T. Prods. v Barr*, 54 AD2d 315, 44 NY2d 226; *People v Feinberg*, 19 Misc 2d 433; *Church of St. Paul & St. Andrew v Barwick*, 67 NY2d 510; *Matter of Morgenthau v Erlbaum*, 59 NY2d 143; *People v Cocco*, 285 App Div 856.)

*Robert Odawi Porter*, Salamanca, *Christopher Karns* and *Kanji & Katzen, PLLC*, Seattle, Washington (*Riyaz A. Kanji* and *Cory J. Albright* of counsel), for Seneca Nation of Indians, amicus curiae. I. The Appellate Division correctly construed the relationship between Tax Law §§ 471-e and 471 and the current stamping requirements of the Tax Law. (*Oklahoma Tax Comm'n v Chickasaw Nation*, 515 US 450; *Department of Taxation & Finance of N. Y. v Milhelm Attea & Bros.*, 512 US 61; *Day*

*Wholesale, Inc. v State of New York,* 51 AD3d 383; *City of New York v Smokes-Spirits.Com, Inc.,* 12 NY3d 616; *Gritted's Foods, Inc. v Unkechauge Nation,* 532 F Supp 2d 439; *People v Tracy,* 1 Misc 3d 308; *Matter of New York Assn. of Convenience Stores v Urbach,* 92 NY2d 204, 181 Misc 2d 589, 275 AD2d 520; *Snyder v Wetzler,* 193 AD2d 329, 84 NY2d 941.) II. The ill-advised, erroneous legal conclusions of the District Court in *City of New York v Golden Feather Smoke Shop* (2009 WL 705815, 2009 US Dist LEXIS 20953) do not justify the counties' unprecedented interpretation of the Tax Law. (*Wagnon v Prairie Band Potawatomi Nation,* 546 US 95; *United States v Morrison,* 596 F Supp 2d 661; *United States v Garcia,* 413 F3d 201; *Allstate Ins. Co. v Serio,* 261 F3d 143; *West v American Telephone & Telegraph Co.,* 311 US 223; *Pentech Intl., Inc. v Wall St. Clearing Co.,* 983 F2d 441; *City of New York v Smokes-Spirits.com, Inc.,* 541 F3d 425; *Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc.,* 344 F3d 211; *City of New York v Milhelm Attea & Bros., Inc.,* 550 F Supp 2d 332, 591 F Supp 2d 234; *Mullaney v Wilbur,* 421 US 684.) III. The counties ask this Court to substitute its judgment for that of the Legislature and to nullify two decades of legislative, executive and judicial decisionmaking. (*People v Finnegan,* 85 NY2d 53; *City of New York v Milhelm Attea & Bros., Inc.,* 550 F Supp 2d 332; *Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344; *Matter of Anonymous,* 40 NY2d 96; *People v Harris,* 98 NY2d 452; *Campaign for Fiscal Equity, Inc. v State of New York,* 8 NY3d 14; *People ex rel. Eisman v Ronner,* 185 NY 285; *Ruland v Tuthill,* 187 App Div 20; *Matter of New York Assn. of Convenience Stores v Urbach,* 92 NY2d 204, 181 Misc 2d 589, 275 AD2d 520, 95 NY2d 931, 96 NY2d 717.)

*Stephen J. Acquario, General Counsel, New York State Association of Counties,* Albany, *Robert W. Gibbon* and *Jeffrey D. Klein* for New York State Association of Counties and another, amici curiae. I. Tax Law § 471 is the sole taxing authority for cigarette sales in New York. (*United States v Morrison,* 596 F Supp 2d 661.) II. New York State has authority to tax on- and off-reservation sales to non-natives. (*Moe v Confederated Salish & Kootenai Tribes of Flathead Reservation,* 425 US 463; *Department of Taxation & Finance of N. Y. v Milhelm Attea & Bros.,* 512 US 61; *Washington v Confederated Tribes of Colville Reservation,* 447 US 134.) III. Tax Law § 471-e is inapplicable as it relates to the taxing authority provided under Tax Law § 471. (*Day Wholesale, Inc. v State of New York,* 51 AD3d 383.) IV. Tax Law §§ 471 and 471-e are not read together in order to create

the taxing authority necessary to collect the cigarette tax in this instance. (*People v Avilas, Inc.*, 29 AD3d 764; *Doe v State of New York*, 11 AD3d 579.) V. The lands in question are not part of a qualified reservation and therefore section 471-e of the Tax Law is inapplicable. (*Cayuga Indian Nation of N.Y. v Pataki*, 413 F3d 266; *City of Sherrill v Oneida Indian Nation of N. Y.*, 544 US 197.) VI. The Cayuga Indian Nation is not in compliance with the statutory burden to collect the tax. VII. The District Attorney and the County Sheriff had the authority to act in order to prevent plaintiff's illegal conduct. (*Matter of Schumer v Holtzman*, 60 NY2d 46; *People v Di Falco*, 44 NY2d 482; *Liquifin Aktiengesellschaft v Brennan*, 446 F Supp 914; *Matter of Holtzman v Goldman*, 71 NY2d 564.) VIII. Plaintiff-respondent's tax revenue argument is without merit.

*Patrick McKenna, General Counsel, American Cancer Society, Eastern Division, Inc.*, Albany, and *Schnader Harrison Segal & Lewis LLP*, New York City (*Bruce Strikowsky* and *Allison N. Fihma* of counsel), for American Cancer Society, amicus curiae. I. There is a direct inverse correlation between the price of cigarettes and rates of tobacco consumption. II. Excise taxes are particularly effective in reducing smoking among young people and pregnant women.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Stephen J. McGrath, Victoria Scalzo, Eric Proshansky* and *William H. Miller* of counsel), for City of New York, amicus curiae. I. The Appellate Division majority's construction of Tax Law §§ 471 and 471-e is inconsistent with several provisions of the Tax Law and is contradicted by the legislative history. (*Lorillard Tobacco Co. v Roth*, 99 NY2d 316; *Matter of Great Lakes-Dunbar-Rochester v State Tax Commn.*, 65 NY2d 339; *Matter of Fineway Supermarkets v State Liq. Auth.*, 48 NY2d 464.) II. The Legislature did not believe that regulations were necessary to impose a tax. (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801.)

*Margaret A. Murphy*, Hamburg, for Day Wholesale, Inc., amicus curiae. I. Through the administrative rule-making process, New York has adopted a policy of forbearance that allows non-tax-exempt consumers to purchase unstamped cigarettes from reservation cigarette sellers. (*Day Wholesale, Inc. v State of New York*, 51 AD3d 383; *Department of Fin. of City of N.Y. v New York Tel. Co.*, 262 AD2d 96; *Worcester v Georgia*, 6 Pet [31 US] 515; *Washington v Confederated Tribes of Colville Reservation*,

447 US 134; *Moe v Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 US 463; *Matter of New York Assn. of Convenience Stores v Urbach*, 275 AD2d 520, 95 NY2d 931, 96 NY2d 717, 534 US 1056; *Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801; *Matter of Campagna v Shaffer*, 73 NY2d 237.) II. Until Tax Law § 471-e takes effect, Tax Law § 471-a continues as the only legislative mechanism for the collection of applicable taxes on reservations sales. (*Day Wholesale, Inc. v State of New York*, 51 AD3d 383; *Matter of United Univ. Professions v State of New York*, 36 AD3d 297; *Matter of Guardian Life Ins. Co. of Am. v Chapman*, 302 NY 226; *White Mountain Apache Tribe v Bracker*, 448 US 136; *Department of Taxation & Finance of N. Y. v Milhelm Attea & Bros.*, 512 US 61; *Keweenaw Bay Indian Community v Rising*, 477 F3d 881.)

**OPINION OF THE COURT**

GRAFFEO, J.

In this appeal involving a dispute between law enforcement authorities and the Cayuga Indian Nation concerning the collection of cigarette sales taxes, two principal issues are presented. The first is whether the Cayuga Indian Nation was entitled to a declaration that two convenience stores it operates in Central New York are located on "qualified reservation" property within the meaning of Tax Law § 470 (16) (a). The second is whether, absent the implementation of a statutory or regulatory scheme addressing the specific tax collection issues posed by the retail sale of cigarettes on Indian reservations, Nation retailers can be prosecuted for the possession and sale of untaxed cigarettes under Tax Law § 471.

## I. The background of this dispute

The current controversy between the Cayuga Indian Nation and law enforcement authorities in Seneca and Cayuga Counties cannot be resolved without an understanding of New York State's past efforts to collect taxes derived from the retail sale of cigarettes on Indian reservations. Since 1939, New York has imposed sales taxes on cigarettes sold in this state under Tax Law § 471, which generally requires the use of tax stamps that are purchased by cigarette wholesalers and then affixed to packages of cigarettes. Under the statute, the "agent"—typically the wholesaler—is "liable for the collection and payment of the tax on cigarettes . . . and shall pay the tax to the tax commission by purchasing" tax stamps (Tax Law § 471 [2]). Having prepaid the sales taxes, wholesalers pass the tax obligation on to

distributors who, in turn, collect the taxes from retailers, until they are finally paid by consumers. Thus, the "ultimate incidence of and liability for the tax [falls] upon the consumer" (Tax Law § 471 [2]). Tax Law § 1814 declares that it is a misdemeanor to willfully evade the cigarette tax.[1]

Tax Law § 471 (1) recognizes that there are certain instances when the State must forgo cigarette tax collection because it is "without power to impose such tax." At the time of its enactment in 1939, one of those situations included the sale of cigarettes occurring on Indian reservations since states were not authorized to tax goods sold by an Indian Nation on its reservation until 1976. That year the United States Supreme Court decided *Moe v Confederated Salish & Kootenai Tribes of Flathead Reservation* (425 US 463, 483 [1976]), which held that states may impose sales taxes on goods sold by members of an Indian nation on reservation land to purchasers who are not members of the nation, particularly when it is the non-Indian purchaser who bears the ultimate tax burden under state law.

In the aftermath of *Moe*, in 1988 the New York Department of Taxation and Finance promulgated regulations aimed at implementing a scheme to calculate and collect the sales taxes due from sales to non-Indians on reservation properties in New York. The regulations adopted a "probable demand" mechanism that limited the quantity of unstamped—i.e., "untaxed"— cigarettes that wholesalers or distributors could sell to tribes and tribal retailers. The Department would either project the "probable demand" for cigarettes attributable to members of a particular Indian tribe or nation, thereby restricting the quantity of unstamped cigarettes that could be sold to that tribe or nation to that estimated number, or enter into agreements with tribal leaders to determine probable demand. Tax exemption coupons would be issued to Indian retailers representing their monthly allotment under the probable demand formulation and the retailers could then exchange those coupons with wholesalers for unstamped cigarettes. Retailers were to sell unstamped cigarettes only to "qualified Indians," who would be provided with individual exemption certificates to present to retailers when purchasing cigarettes.

The 1988 regulations were never implemented by the Department, however, because the proposed tax collection scheme was

---

1. Depending on the quantity of cigarettes involved and whether the offender has prior violations, evasion of cigarette sales taxes can constitute a felony (Tax Law § 1814 [a]-[c]).

immediately challenged by cigarette wholesalers who claimed the regulations were preempted by federal statutes governing trade with Indians. The litigation proceeded to the United States Supreme Court, which ultimately rejected the wholesalers' contention in 1994 (*see Department of Taxation & Finance of N. Y. v Milhelm Attea & Bros.*, 512 US 61 [1994]). The Supreme Court reaffirmed the principle articulated in *Moe* and further declared that "States may impose on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes from non-Indians" (*id.* at 73). Thus, the Court recognized the authority of states to collect sales taxes relating to cigarettes sold to non-Indians on reservation property or other Indian lands provided the regulatory scheme is not "unduly burdensome" (*id.* at 76).

After analyzing New York's regulations, the *Milhelm* Court concluded that they were not preempted by federal laws regulating Indian trading, but it did not "assess for all purposes each feature of New York's tax enforcement scheme that might affect tribal self-government or federal authority over Indian affairs" (*id.* at 69). Without endorsing every aspect of the New York approach, the Supreme Court approved in principle the "probable demand" methodology, while acknowledging that an "inadequate quota may provide the basis for a future challenge to the *application* of the regulations" (*id.* at 75). The Court emphasized that "[i]f the Department's 'probable demand' calculations are adequate, tax-immune Indians will not have to pay New York cigarette taxes and neither wholesalers nor retailers will have to precollect taxes on cigarettes destined for their consumption" (*id.*).[2] Finally, the Court concluded that the record-keeping requirements imposed under the regulations were less onerous than comparable provisions that had been upheld in *Moe* and would not impermissibly interfere with Indian trading activities (*id.* at 76).

Because *Milhelm* was commenced by non-Indian wholesalers, the Supreme Court addressed the narrow preemption issue before it and did not fully explicate the interests of Indian nations or tribes affected by the regulations (*id.* at 68-70).

2. This appears to have been an important consideration in the Court's decision to sustain the regulations as it restated this proposition later in the opinion (*see Milhelm*, 512 US at 76 ["assuming that the 'probable demand' calculations leave ample room for legitimately tax-exempt sales, the precollection regime will not require prepayment of any tax to which New York is not entitled"]).

Although it rejected the wholesalers' facial challenge to the regulations, the Court was clearly aware of the enforcement difficulties that states faced when attempting to collect sales taxes directly from Indian tribes given their immunity from civil suits for nonpayment; it acknowledged that tax collectors must employ "alternative remedies" to ensure compliance, such as entering into agreements with the tribes, pursuing civil damages actions against individual members or engaging in off-reservation interdiction efforts (*id*. at 72).

Enforcement of the regulations was stayed during the course of the *Milhelm* litigation but the release of the decision in June 1994 seemingly paved the way for implementation. But, soon after *Milhelm* was decided, the Department announced that enforcement efforts would be delayed pending consideration of other issues arising from the decision and to allow for negotiations with the tribes in an attempt to enter into compacts or agreements pertaining to the collection of sales taxes. When the regulations had still not been put into effect more than a year later, an association of convenience store owners commenced an action in 1995 to compel enforcement of these regulations and similar provisions relating to sales taxes on motor fuel (*see Matter of New York Assn. of Convenience Stores v Urbach*, 92 NY2d 204 [1998]). The Association claimed that the equal protection rights of its members had been violated by the State's selective enforcement of cigarette and gasoline sales taxes and the policy of forbearance against Indian retailers who were selling untaxed cigarettes and gasoline to non-Indians at reservation stores.

Although the Association prevailed in the lower courts, which employed a strict scrutiny analysis in finding that the forbearance policy amounted to unlawful discrimination, this Court rejected that argument, concluding that distinctions between sales on Indian reservations and other types of sales did not implicate invidious racial classifications because of the unique status enjoyed by Indian tribes under federal law. We held that the classification should be subjected to the rational basis test, rather than strict scrutiny, but we did not proceed to apply that test since state policy had changed during the course of the litigation. Although the Department's policy of forbearance had initially been temporary, by the time the case was argued in this Court, it had become permanent—the Department announced in 1998 that it was repealing the regulations. In its notice of repeal, the Department explained that, as a practical matter, the regulations could not achieve their intended purposes and

that repeal was predicated on the "State's respect for the Indian Nations' sovereignty" (*id.* at 214, quoting 20 NY Reg, Apr. 29, 1998, Issue 17, at 23). "Since these rules provided the only regulatory framework for enforcing the motor fuel and cigarette taxes on Indian reservations, their repeal signified that the Tax Department has committed itself to withholding active enforcement on a long-term basis" (*New York Assn. of Convenience Stores*, 92 NY2d at 214). In light of this pronouncement, we remitted the case to the lower courts to assess, in the first instance, whether the now-permanent forbearance policy met the rational basis standard.

On remittal, both Supreme Court and the Appellate Division concluded that it did. The Appellate Division explained:

> "The record . . . makes plain that the statutes cannot effectively be enforced without the cooperation of the Indian tribes. Because of tribal immunity, the retailers cannot be sued for their failure to collect the taxes in question, and State auditors cannot go on the reservations to examine the retailers' records.
>
> "Additionally, the Department cannot compel the retailers to attend audits off the reservations or compel production of their books and records for the purpose of assessing taxes. In that regard, representatives of the Department engaged in extensive negotiations with the tribes in an effort to arrive at an acceptable agreement. Those efforts were largely unsuccessful and the vast majority of the Indian retailers refused to register with the Department. In further efforts to enforce the statute, the State attempted interdiction, i.e., interception of tobacco and motor fuel shipments and seizure of those shipments that were found to be in noncompliance with the Tax Law. That strategy resulted in civil unrest, personal injuries and significant interference with public transportation on the State highways. In our view, all of these factors provide a rational basis for the differential treatment of the parties" (*Matter of New York Assn. of Convenience Stores v Urbach*, 275 AD2d 520, 522-523 [3d Dept 2000], *lv denied* 96 NY2d 717 [2001], *cert denied sub nom. New York Assn. of Convenience Stores v Roth*, 534 US 1056 [2001]).

The next significant policy shift occurred in 2003 when the Legislature adopted Tax Law § 471-e, which directed the Department to issue whatever regulations would be necessary to collect cigarette taxes on reservation sales to non-Indians (*see* former Tax Law § 471-e, added by L 2003, ch 62, part T3, § 4, as amended by L 2003, ch 63, part Z, § 4).[3] As a result, the Department drafted a new set of regulations but they were never formally adopted. Consequently, in 2005, the Legislature amended Tax Law § 471-e by declaring that "qualified Indians" have a right to purchase tax-exempt cigarettes on the "qualified reservation" of their tribe or nation for their own consumption. The statute further clarified that "non-Indians making cigarette purchases on an Indian reservation shall not be exempt from paying the cigarette tax when purchasing cigarettes within this state" (Tax Law § 471-e [1]; *see* L 2005, ch 61, part K, §§ 1-2, as amended by L 2005, ch 63, part A, § 4 [a 2004 attempt to enact similar legislation had been foiled by gubernatorial veto]).

The amendment also incorporated the Department's proposed regulations into Tax Law § 471-e, thereby creating a statutory mechanism for calculating and collecting sales taxes relating to on-reservation purchases by non-Indians. Although it differed from the 1988 regulatory scheme, Tax Law § 471-e also used a coupon system as the mechanism of enforcement. The Department was required to determine the "probable demand" for cigarettes by tribal members through various means (including potential agreements with the tribes) and periodically issue to the governing body of a tribe tax exemption coupons representing the amount of cigarettes likely to be consumed by tribal members each quarter. Cigarette wholesalers were to pay the sales taxes on all cigarettes in their possession, meaning all packages were to bear tax stamps, even those destined for on-reservation sales to tribe members. A tribe could purchase cigarettes for use by members without paying sales taxes by proffering tax exemption coupons provided by the Department. The wholesaler, in turn, would use the coupons to obtain a

---

3. Former Tax Law § 471-e provided:
 "Where a non-native American person purchases, for such person's own consumption, any cigarettes or other tobacco products on or originating from native American nation or tribe land recognized by the federal government and reservation land recognized as such by the state of New York, the commissioner shall promulgate rules and regulations necessary to implement the collection of sales, excise and use taxes on such cigarettes or other tobacco products" (L 2003, ch 63, part Z, § 4).

refund from the Department for its overpayment of cigarette taxes (the wholesaler would have already paid the sales taxes on the cigarettes it provided to the tribes in exchange for the coupons).[4]

The effective date provision applicable to Tax Law § 471-e (L 2005, ch 63, part A, § 4, amending L 2005, ch 61, part K, § 7) directed that the statute "shall take effect March 1, 2006, provided that any actions, rules and regulations necessary to implement the provisions of this act on its effective date are authorized and directed to be completed on or before such date." But the Department did not meet this deadline. It did not make the "probable demand" calculations or issue the tax exemption coupons that were integral to the tax collection methodology. In a March 16, 2006 advisory opinion, the Department explained that it intended to continue its policy of forbearance, meaning that it would not actively attempt to collect from wholesalers, distributors or Indian retailers, cigarette sales taxes associated with on-reservation sales (see NY St Dept of Taxation & Fin Advisory Op No. TSB-A-O6[2]M, available at http://www.tax.state.ny.us/pdf/advisory_opinions/misc/a06_2m.pdf). The Department further advised that, if it "revise[d] its policy in the future, it [would] provide adequate notice to all affected stamping agents" (id.)

Soon after the proposed effective date passed, a cigarette wholesaler and a tribal retailer initiated a declaratory judgment action against the State and the Attorney General (who had threatened to enforce the statute, despite the Department's forbearance policy) seeking a determination that the amended version of Tax Law § 471-e was not enforceable, together with a preliminary injunction precluding any enforcement efforts. Supreme Court granted the preliminary injunction, reasoning that the statute was not in effect because the conditions precedent in the effective date provision had not been fulfilled and, in May 2008, the Appellate Division agreed (see Day Wholesale, Inc. v State of New York, 51 AD3d 383 [4th Dept 2008]). The appellate court noted:

---

4. In this significant respect, the tax collection methodology codified in 2005 in Tax Law § 471-e differed from the system adopted in the 1988 regulations. The statute requires prepayment of taxes on cigarettes ultimately involved in tax-exempt sales, in contrast to the 1988 regulations which, as emphasized in Milhelm, did not require wholesalers to prepay taxes on cigarettes destined for consumption by tax-exempt Indian purchasers (see Milhelm, 512 US at 75, 76).

"there is no question that the Legislature intended to create a procedure that would permit the State to collect cigarette taxes on reservation sales to non-Indians and non-members of the nation or tribe while simultaneously exempting from such tax reservation sales to qualified Indian purchasers. Because both aspects of the procedure must function simultaneously, the Legislature provided for a system utilizing Indian tax exemption coupons to distinguish taxable sales from tax-exempt sales. Without the coupon system in place, cigarette wholesale dealers and reservation cigarette sellers have no means by which to verify sales to tax-exempt purchasers" (*id.* at 387).

The preliminary injunction issued in *Day* has not been disturbed and the parties in this case agree that Tax Law § 471-e is not "in effect" and therefore remains unenforceable.[5] Thus, at present, there is no enforceable statutory or regulatory scheme specifically addressing the calculation or collection of taxes arising from the on-reservation retail sale of cigarettes. Moreover, the Department—the agency charged by the Legislature with the collection of the taxes—has not to date implemented a system that uses Indian retailers as an intermediary for collection of cigarettes sales taxes from consumers.[6]

Against this historical synopsis, we turn to the facts giving rise to this controversy.

---

**5.** The decision in *Day* is not before this Court for review and we express no view on the issue presented in that case. For purposes of this appeal, we merely assume, as do the parties and the dissent, that Tax Law § 471-e is not "in effect."

**6.** While this appeal has been pending before us, the Department of Taxation and Finance has announced a change in policy. On February 23, 2010, it withdrew its March 16, 2006 Advisory Opinion and announced new proposed regulations that, when implemented, will impose a tax exemption coupon system for the collection of sales taxes. Notably, one of the proposed regulations assumes that the Cayuga Indian Nation has a reservation and is selling cigarettes on that property since it includes the Cayuga among the list of tribes for whom "the probable demand of the qualified Indians on the nation's or tribe's qualified reservation" must be calculated and makes a preliminary calculation of the Nation's probable demand (*see* proposed 20 NYCRR 74.6 [f] [2] [i], available at http://www.tax.state.ny.us/pdf/rulemaking/feb2310/agentcertification/text.pdf). This development does not moot the issues presented in this case, however, since defendants' enforcement efforts are predicated on alleged past violations of the Tax Law and the proposed regulations will not become effective until completion of the formal procedure required under the State Administrative Procedure Act.

## II. This litigation

Plaintiff Cayuga Indian Nation operates two convenience stores in Cayuga and Seneca Counties on parcels of real property it purchased on the open market in 2003. The parcels are situated on what had been the Nation's approximately 65,000-acre aboriginal reservation but, by 1807, title to all of this reservation property had been transferred to the State and subsequently purchased by private successors in interest. The Nation acknowledges that it sells cigarettes on these properties both to its tribal members and non-Indian consumers and that the cigarettes do not bear tax stamps evidencing payment of New York cigarette sales taxes. For purposes of this litigation, it is also undisputed that Nation retailers at these two locations are involved in retail sales to consumers—not cigarette wholesaling activities.

In September 2008, the District Attorneys of Seneca and Cayuga Counties wrote to the Commissioner of Taxation and Finance requesting the Department's assistance in preventing the sale of untaxed cigarettes and other products by the Nation's retailers. In response, the Commissioner advised: "Governor Paterson is currently engaged in discussions with New York's Native American nations and tribes in an effort to resolve the many complex and important issues that have confounded multiple administrations for decades. Given these circumstances, we are constrained not to participate in your investigations." The Commissioner further expressed the "hope" that they would "exercise care to avoid taking actions that might disrupt or undermine the Governor's current global negotiations."

Dissatisfied with the Department's response, law enforcement authorities in both counties decided to pursue their own enforcement efforts. In November 2008, they obtained and executed search warrants in both stores operated by the Nation, confiscating the inventories of unstamped cigarettes, among other items. At that time, no criminal action had been commenced against the Nation, any of its members or any other individual in connection with the sale of cigarettes at the convenience stores.

The day after the warrants were executed, the Cayuga Indian Nation brought this declaratory judgment action against the Sheriffs and District Attorneys of Cayuga and Seneca Counties (hereinafter DAs). Because Tax Law § 471-e—the statute that

creates a specialized tax exemption coupon system for the collection of taxes associated with the on-reservation retail sale of cigarettes—is not in effect, the Nation sought a declaration that it is under no obligation to collect and transmit to the Department sales taxes on the cigarettes it sells to consumers in its stores because they are located on "qualified reservation" property within the meaning of Tax Law § 470 (16) (a). Contending that no laws were being violated, the Nation claimed that the law enforcement authorities lacked the power to obtain a search warrant or seize property and demanded the return of the confiscated items. The Nation also sought an injunction barring the authorities from alleging that the Nation, or any of its employees, was violating the Tax Law by possessing or selling unstamped cigarettes on reservation land, asserting that such injunctive relief should remain in effect until a system for calculating and collecting the taxes stemming from on-reservation retail sales is properly put in place by the Department of Taxation and Finance.

The Nation moved for a preliminary injunction and the DAs cross-moved to dismiss the action arguing that the Nation could not evade the application of criminal laws by commencing a declaratory judgment action. In the alternative, the DAs asserted that their motion should be converted to an application for summary judgment because the facts were undisputed and the issue distilled to whether the convenience stores were located on a reservation and, if so, whether District Attorneys could enforce the existing criminal laws governing the collection of cigarette sales taxes in that context. During oral argument on the cross motions, the Nation agreed that the pending applications should be treated as requests for summary judgment.

Because no criminal action was pending against the Nation or any other individual associated with the operation of the convenience stores, Supreme Court concluded that the Nation could pursue its declaratory judgment action insofar as it challenged the scope and enforceability of the relevant cigarette tax statutes, but it could not contest the validity of the search warrant or the propriety of its execution in a collateral civil action. It therefore dismissed the action to the extent it challenged the search warrant or sought return of the property that had been

seized (21 Misc 3d 1142[A], 2008 NY Slip Op 52478[U]).[7] The court then rejected the Nation's remaining claims on the merits, concluding that Tax Law § 471—the general statute that imposes a tax on cigarettes sold in New York—precluded any retailer, including an Indian nation engaging in on-reservation sales to consumers, from possessing or selling unstamped cigarettes. The court reasoned that the DAs could use a criminal prosecution to enforce the general directive in Tax Law § 471, even though Tax Law § 471-e was not in effect. Supreme Court also concluded that the sales in question did not occur on a "qualified reservation" within the meaning of Tax Law § 470 (16) (a), nor could the Nation exercise sovereign power over the property based on the analysis of the United States Supreme Court in *City of Sherrill v Oneida Indian Nation of N. Y.* (544 US 197 [2005]).

In the days following Supreme Court's decision, the DAs indicated that sealed indictments had been handed up by grand juries in Cayuga and Seneca Counties. But the individuals or entities named in those indictments have not been disclosed, nor has the criminal prosecution progressed, because the Nation appealed Supreme Court's order to the Appellate Division, which reversed the order insofar as appealed from and granted declaratory relief to the Nation (66 AD3d 100 [2009]).

The Appellate Division agreed with Supreme Court that the declaratory judgment action could proceed because no criminal charge was pending at the time the civil action was initiated. But it unanimously rejected Supreme Court's analysis of the qualified reservation issue, concluding that the Nation was entitled to a declaration that the convenience stores were situated on property that qualified as a reservation within the meaning of Tax Law § 470 (16) (a). The Appellate Division split, however, regarding Supreme Court's interpretation of Tax Law § 471. The majority rejected the argument that the general statute provided an independent basis for enforcement action against the Nation or its employees, holding that a cigarette tax cannot be collected from an Indian nation (and, as a result, criminal penalties for noncompliance with the cigarette tax laws cannot be pursued) without a system in place that permits

---

7. It is not clear that the Nation appealed that part of Supreme Court's judgment to the Appellate Division, nor does the Nation argue in this Court that Supreme Court erred in dismissing the portions of its complaint challenging the execution of the search warrant. We therefore have no occasion to address that issue.

wholesale dealers and reservation sellers to lawfully distinguish between cigarettes destined to be sold to tax-exempt purchasers (members of the Cayuga Nation) and those earmarked for sale to other consumers. Given that sales by Indians to members of their tribe are tax-exempt under federal law, the majority viewed Tax Law § 471 as insufficient to establish the procedures for the lawful imposition and collection of such a tax. A single Justice dissented on the scope of Tax Law § 471, concluding that the provision unreservedly imposes a tax on all cigarettes sold in New York, including on-reservation retail sales to non-Indians, and the absence of a specialized collection mechanism did not preclude prosecution of Indian retailers for failing to collect the taxes. The Appellate Division granted the DAs leave to appeal to this Court, certifying the question: "Was the order of this Court . . . properly made?"

### III. The propriety of the declaratory judgment action

We first address an important procedural issue. Relying on our decision in *Kelly's Rental v City of New York* (44 NY2d 700 [1978]), the DAs assert that this declaratory judgment action—which was commenced the day after the search warrants were executed—should have been dismissed on the ground that it would interfere with a pending criminal prosecution. Both lower courts rejected this argument as do we.

The general rule is that, once a criminal action has been initiated, a criminal defendant may not bring a declaratory judgment action to raise a statutory interpretation or other issue that can be adjudicated in the criminal prosecution (*see generally Reed v Littleton*, 275 NY 150 [1937]; *New York Foreign Trade Zone Operators, Inc. v State Liq. Auth.*, 285 NY 272 [1941]; *see e.g. Kelly's Rental, supra*).[8] The prohibition on declaratory judgment actions in this circumstance is comparable to the rule generally precluding a writ of prohibition by a criminal defendant—an adequate opportunity to raise legal arguments and receive appropriate relief will be available to the defendant in the criminal prosecution, particularly given a defendant's right to appeal adverse rulings in the event of a

---

8. This rule does not foreclose a party, based solely on their status as a criminal defendant, from raising issues in a declaratory judgment action that cannot be resolved in the criminal action and that, even if sustained, will not supply a basis to prevent the prosecution or collaterally attack the conviction (*cf. Hurrell-Harring v State of New York*, 15 NY3d 8 [2010]).

conviction.[9] Before a criminal action is commenced, however, a declaratory judgment action may be entertained in the discretion of the court if "the constitutionality or legality of a statute or regulation is in question and no question of fact is involved" (*Ulster Home Care v Vacco*, 255 AD2d 73, 77 [3d Dept 1999]; *see New York Foreign Trade Zone Operators, supra*).

The DAs point out that, in *Kelly's Rental*, we stated that "[a] party against whom a criminal proceeding is pending may not seek declaratory relief" (44 NY2d at 702) and therefore referred to the commencement of a "criminal proceeding" as the point when a defendant is foreclosed from bringing such an action, rather than the commencement of a criminal action. As they correctly note, under the Criminal Procedure Law, the filing of a search warrant application commences a "criminal proceeding" (*see* CPL 1.20 [18]; *see Matter of B. T. Prods. v Barr*, 54 AD2d 315, 319-320 [1976], *affd* 44 NY2d 226 [1978]) while a "criminal action" is not initiated until an accusatory instrument is filed against a defendant (*see* CPL 1.20 [16]).

Our holding in *Kelly's Rental* falls neatly within the general rule. In that case, a private car rental company initiated an action seeking a declaration that a New York City Administrative Code provision imposing a licensing requirement did not apply to private car rental companies. Noting that the company and its employees had received "numerous summonses to appear in Criminal Court for alleged violations" of the provision, we concluded that "[a] party against whom a criminal proceeding is pending may not seek declaratory relief" (*Kelly's Rental*, 44 NY2d at 702). It was evident in that case that criminal prosecutions had been commenced against individual defendants, including the private car rental company, which barred the company's pursuit of declaratory relief in a collateral, civil action.

■ We did not cite the Criminal Procedure Law in *Kelly's Rental*, nor did we mean to invoke the definition embodied therein when we used the phrase "criminal proceeding" informally instead of the more technically accurate "criminal action" to describe the procedural posture of the underlying prosecution. Our holding in *Kelly's Rental* did not expand the

---

**9.** In contrast, because their right to appeal adverse rulings in criminal cases is severely circumscribed, the People can initiate a declaratory judgment action in certain limited circumstances to challenge an interlocutory ruling by a criminal court (*see Matter of Morgenthau v Erlbaum*, 59 NY2d 143 [1983], *cert denied* 464 US 993 [1983]).

rule precluding the use of declaratory judgment actions to encompass situations like this one where a search warrant application was executed but no party was named as the defendant and no accusatory instrument had been filed against any person or company at the time civil relief was sought. A search warrant often targets a place without identifying a defendant. As such, it is not accurate to say that, in every case where a search warrant application has been filed, a criminal prosecution has been commenced, particularly since a warrant may be requested long before a decision is made to file criminal charges. A party is not categorically precluded from initiating a declaratory judgment action based on nothing more than the execution of a search warrant when the issue to be raised involves a pure question of law—such as a query concerning the scope and interpretation of a statute or a challenge to its constitutional validity—and the facts relevant to that issue are undisputed, as they are here. Because no criminal action had been initiated against any identified party at the time this declaratory judgment action was commenced, the decision whether the action could be entertained fell soundly within the realm of discretion possessed by the lower courts and we discern no abuse of that discretion in the denial of the motion to dismiss.

### IV. Whether the Nation's convenience stores are located on a "qualified reservation" under Tax Law § 470 (16) (a)

Although it is undisputed that the reacquired land on which the convenience stores are situated falls within the Cayuga aboriginal reservation, the DAs maintain that the property does not meet the definition of a "qualified reservation" under Tax Law § 470 (16) (a). Hence, they contend that, even assuming that the general statutes criminalizing the possession and sale of unstamped cigarettes cannot be enforced against Indian retailers engaged in on-reservation sales as the Nation asserts, they can be enforced against the Nation and its employees because the convenience stores are not located on a reservation.

Whether the convenience stores sit on reservation land presents a critical threshold consideration. Federal law currently precludes a state from collecting cigarette sales taxes on sales by Indians to members of their own tribe or nation only if those sales occur on a reservation or other Indian lands (*see e.g. Moe, supra*, 425 US 463 [1976]). If the convenience stores are not on parcels entitled to recognition as reservation land, no federal exemption applies to any of the cigarette sales associated with

that location, regardless of the status of the customers who purchase the cigarettes. And if all of the transactions are taxable, the lack of a specific calculation or collection methodology that distinguishes between sales to members of the tribe and sales to other consumers is irrelevant and cannot be asserted as a basis to avoid compliance with the general cigarette sales tax statutes that govern the behavior of every other New York cigarette retailer.

The Nation contends that the two convenience stores stand on parcels that fall within the definition of a "qualified reservation" under Tax Law § 470 (16), which provides:

"16. 'Qualified Reservation.'

"(a) Lands held by an Indian nation or tribe that is located within the reservation of that nation or tribe in the state;

"(b) Lands within the state over which an Indian nation or tribe exercises governmental power and that are either (i) held by the Indian nation or tribe subject to restrictions by the United States against alienation, or (ii) held in trust by the United States for the benefit of such Indian nation or tribe;

"(c) Lands held by the Shinnecock Tribe or the Poospatuck (Unkechauge) Nation within their respective reservations; or

"(d) Any land that falls within paragraph (a) or (b) of this subdivision, and which may be sold and replaced with other land in accordance with an Indian nation's or tribe's land claims settlement agreement with the state of New York, shall nevertheless be deemed to be subject to restriction by the United States against alienation."

This provision was added to the cigarette sales tax article at the same time that Tax Law § 471-e was amended in 2005 and was intended to define the terms used in that statute (*see* L 2005, ch 61, part K). Despite the controversy over Tax Law § 471-e, neither party has argued that section 470 (16) is not "in effect."

The Nation claims that the convenience store properties are covered by paragraph (a) because they are "[l]ands held by an Indian nation or tribe" since the Nation possesses title and they are located within the Nation's aboriginal reservation, which has never been extinguished or disestablished by the federal

government—the only entity with the power to divest property of its reservation status. Thus, the Nation argues that the term "reservation" in paragraph (a) refers to property recognized as such by the federal government.

The DAs counter that the term encompasses only reservations that had previously been recognized by the State Department of Taxation and Finance. Relying on the fact that, in a general tax exemption regulation promulgated pursuant to Tax Law § 1116 in 1982 (*see* 20 NYCRR 529.9), the Cayuga Nation was not included on a list of tribes with reservations in New York, they assert that the term "reservation" cannot be deemed to include property owned by the Nation.

■ We conclude that, when the Legislature used the term "reservation" in Tax Law § 470 (16) (a), it intended to refer to any reservation recognized by the United States government. Our analysis begins with the observation that paragraphs (a) and (b) of Tax Law § 470 (16) appear to have been modeled after the definition of "Indian lands" in the federal Indian Gaming Regulatory Act (IGRA) (*see* 25 USC § 2703 [4]). Under IGRA, "Indian lands" encompass

"(A) all lands within the limits of any Indian reservation; and

"(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power" (*id.*)

The Legislature's decision to borrow the language from this federal statute relating to Indian affairs strongly indicates its intention to include within the definition of a "qualified reservation" property that has been recognized as a reservation by the federal government.

The structure of Tax Law § 470 (16) certainly supports this conclusion since paragraphs (c) and (d)—provisions that have no analogue in IGRA or any other federal statute—address uniquely state concerns. Rather than creating a general definition of reservation property, paragraph (c) identifies two tribes by name, bringing within the definition of "qualified reservation" lands held by the Shinnecock Tribe or the Poospatuck (Unkechauge) Nation within their respective reservations. Because those tribes have been recognized by New York State

but not the United States government, they have not attained the status of a federally recognized reservation.[10] Paragraph (d) similarly covers lands that have received special recognition from New York as that paragraph includes property acquired as a result of the settlement of Indian land claims brought against the State.

Thus, if paragraph (a) had been intended to refer only to reservations recognized by the New York government as the DAs claim, paragraph (c) would have been unnecessary because the term "reservation" in paragraph (a) would already embrace the New York tribes separately named in paragraph (c). Clearly, paragraph (a) was intended to refer to reservations recognized by the federal government while paragraph (c) refers to reservations recognized only by New York State. It is evident from the language and structure of Tax Law § 470 (16) that the Legislature used IGRA as a template for paragraphs (a) and (b)—the provisions referencing Indian lands recognized by the federal government—and then added two additional paragraphs to address reservation property that presented unique state concerns. Thus, the term "reservation" appearing in paragraph (a) references reservation lands recognized by the federal government.

Viewed in this light, the "qualified reservation" question distills to whether the convenience store parcels are viewed as reservation property under federal law. This question cannot be answered without examination of the history of the Cayuga Indian Nation in New York. The Nation is one of the Six Nations of the Iroquois Confederacy that operated in Central New York before the United States was formed. Soon after the adoption of the Federal Constitution, Congress passed what has come to be known as the "Nonintercourse Act," arrogating to itself the exclusive power to regulate commerce with Indian tribes and nations that it had recognized. This Act barred the sale of tribal land without the explicit permission of the federal government.

In the 1794 Treaty of Canandaigua, the United States recognized that the Cayuga Indian Nation possessed an

---

**10.** "Although the State of New York formally recognizes the Unkechauge Nation, the Tribe has no relationship with the federal government" (*City of New York v Golden Feather Smoke Shop, Inc.*, 2009 WL 705815, *12, 2009 US Dist LEXIS 20953, *37 [ED NY 2009]). The Shinnecock Tribe is also recognized by New York but has not yet succeeded in its long-standing efforts to obtain federal recognition, although formal recognition from the United States government may soon be forthcoming (*see* Hakim, *U.S. Eases Way to Recognition for Shinnecock*, New York Times, Dec. 16, 2009, at A1).

approximately 64,000-acre reservation in Central New York (prior to the ratification of the Federal Constitution, the New York government had similarly recognized this reservation). Despite the federal restriction on the alienability of Indian lands contained in the Nonintercourse Act, in 1795 and 1807, the State of New York entered into agreements with the Nation that resulted in the Nation surrendering fee title to all of its reservation lands. Some members of the Cayuga Nation then left New York while others took up residence on the Seneca Nation's New York reservation, where some descendants continue to reside.

Although the Nation no longer possessed fee title to any of its aboriginal reservation lands after 1807, under federal law, the absence of a fee interest is not determinative of the issue of reservation status. It is well settled that only Congress has the power to disestablish or diminish a reservation (*see City of Sherrill*, 544 US at 215 n 9). "Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise" (*Solem v Bartlett*, 465 US 463, 470 [1984]). Thus, the fact that the Nation entered into transactions transferring title to its aboriginal reservation property—including the convenience store parcels that were later reacquired—does not resolve the issue of whether the property in question retained its reservation status under federal law.

In various federal lawsuits, New York has claimed that the 1838 Treaty of Buffalo Creek disestablished some of the reservations that had been recognized in 1794, including the Cayuga reservation. But to date that argument has not been credited by the federal courts. As the Second Circuit noted in *Cayuga Indian Nation of N.Y. v Pataki*, "the Treaty of Buffalo Creek neither mentions Cayuga land or Cayuga title in New York, nor refers to the 1795 or 1807 treaties" between New York and the Cayuga (413 F3d 266, 269 n 2 [2d Cir 2005], *cert denied* 547 US 1128 [2006]). It appears that every federal court that has examined whether the Cayuga reservation was disestablished or diminished by Congress has answered that question in the negative (*see Cayuga Indian Nation of N.Y. v Village of Union Springs*, 317 F Supp 2d 128 [ND NY 2004] [1795 and 1807 transfers of land to New York violated Nonintercourse Act and were void ab initio and Congress did not disestablish or diminish Cayuga reservation in Treaty of Buffalo Creek], *action dismissed on*

*other grounds* 390 F Supp 2d 203 [ND NY 2005]; *Cayuga Indian Nation of N.Y. v Cuomo*, 758 F Supp 107 [ND NY 1991] [lands reserved to Cayuga in 1794 Treaty of Canandaigua could only be divested by Congress] and 730 F Supp 485 [ND NY 1990] [1795 and 1807 conveyances of land to New York were invalid under Nonintercourse Act and were not approved by Congress in the Treaty of Buffalo Creek], *action dismissed on other grounds sub nom. Cayuga Indian Nation of N.Y. v Pataki, supra*, 413 F3d 266 [2005]). Moreover, when the Nation purchased the convenience store properties in 2003, it applied to the United States government to have the parcels taken in trust on behalf of the tribe pursuant to 25 USC § 465. The United States Department of Interior, Bureau of Indian Affairs, has identified the land in question as within the limits of the Cayuga reservation; the fee-for-trust application remains pending and is being processed as a request pertaining to "on reservation" land.

To be sure, the Supreme Court has not yet determined whether parcels of aboriginal lands that were later reacquired by the Nation constitute reservation property in accordance with federal law. Its answer to that question would settle the issue. But based on existing precedent and federal consideration of the fee-for-trust application, the United States government continues to recognize the existence of a Cayuga reservation in New York, as noted in the amicus brief submitted by the United States in support of the Nation's position. In the absence of contrary federal authority, we necessarily must conclude that the convenience store properties in this case meet the definition of a "qualified reservation" under Tax Law § 470 (16) (a).

The DAs' reliance on the United States Supreme Court's decision in *City of Sherrill v Oneida Indian Nation of N.Y.* (*supra*, 544 US 197 [2005]) to the contrary is misplaced. In *City of Sherrill*, the Supreme Court applied the doctrines of laches, acquiescence and impossibility to bar a claim by the Oneida Indian Nation that its repurchase of aboriginal reservation lands resulted in the reassertion of that tribe's sovereign authority relieving the tribe of the obligation to pay real property taxes on the reacquired parcels. Emphasizing the disruptive nature of the real property tax exemption claim, the Court noted that "[p]arcel-by-parcel revival of their sovereign status, given the extraordinary passage of time, would dishonor the historic wisdom in the value of repose" and lead to "[a] checkerboard of alternating state and tribal jurisdiction in New York State— created unilaterally at [the Oneida Nation's] behest" (*id.* at

219-220 [internal quotation marks omitted]). It concluded that this would "seriously burden the administration of state and local governments and would adversely affect landowners neighboring the tribal patches" (*id.* at 220 [internal quotation marks and brackets omitted]).

Because the Oneida history in New York is similar to that of the Cayuga Nation, the DAs argue that the rejection of the Oneida real property tax exemption claim in *City of Sherrill* compels us to reject the Nation's argument in this case that the land it reacquired constitutes "qualified reservation" land within the meaning of Tax Law § 470 (16) (a). They point out that, in the wake of *City of Sherrill*, claims by the Nation seeking possession of land sold to New York in the late eighteenth century have been dismissed by the federal courts under the doctrines of laches, acquiescence and impossibility (*see Cayuga Indian Nation of N.Y. v Pataki, supra,* 413 F3d 266 [2005]). And a claim by the Cayuga that they were exempt from zoning and land use laws on reacquired property in the tribe's aboriginal reservation has similarly been dismissed based on the *City of Sherrill* analysis, under the rationale that avoidance of zoning and land use laws would be just as disruptive as avoidance of real property taxes (*see Cayuga Indian Nation of N.Y. v Village of Union Springs,* 390 F Supp 2d 203 [ND NY 2005]).

In *City of Sherrill* and its progeny, Indian nations and tribes relied on the doctrine of sovereign authority, claiming that their reacquisition of aboriginal reservation lands automatically and unilaterally allowed them to claim immunity from state real property tax and zoning laws. As the Supreme Court explained, the tribe asserted that reacquisition of the land allowed it to "rekindl[e] embers of sovereignty that long ago grew cold" (*City of Sherrill,* 544 US at 214). This is the argument that was rejected in *City of Sherrill* and the subsequent precedent.

In this case, however, the Nation does not suggest that its reacquisition of the convenience store parcels revives its ability to exert full sovereign authority over the property. Rather than seeking immunity from state tax laws, it is actually relying on state tax laws; the Nation contends that, under the plain language of Tax Law § 470 (16) (a), the property it reacquired constitutes "qualified reservation" property.

*City of Sherrill* dealt with whether a tribe could exercise sovereign power over reacquired land for purposes of avoiding real property taxes—not whether reacquired land is ascribed

reservation status under federal law. As to the latter, the lower courts in *City of Sherrill* had held that aboriginal reservation property sold by the Oneida Nation in the early 1800s that had been recently reacquired constituted "Indian country" under 18 USC § 1151 (a), defined as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government." They rejected the assertion by the municipal defendants in that case that the Oneida reservation had been lawfully disestablished by the federal government in the 1838 Treaty of Buffalo Creek. The Supreme Court reaffirmed the principle that "only Congress can divest a reservation of its land and diminish its boundaries" (544 US at 215 n 9 [internal quotation marks omitted]) and did not disturb the holding that the reacquired property constituted Indian country, noting that it did not need to decide whether the Treaty of Buffalo Creek disestablished the Oneida reservation (*City of Sherrill*, 544 US at 215 n 9; *see also id.* at 223 [Stevens, J., dissenting] [noting that the majority accepted the conclusion of the lower courts that the Oneida reservation had never been disestablished or diminished by Congress and that "all of the land owned by the Tribe within the boundaries of its reservation qualifies as Indian country"]). In other words, even assuming that the reservation was not disestablished and that the reacquired land was reservation property as the District Court and Second Circuit had held, the doctrines of laches, acquiescence and impossibility still precluded reassertion by the tribe of sovereign authority over the property for purposes of real property taxation. In decisions postdating *City of Sherrill*, federal courts have continued to hold that the parcels reacquired by the Oneida possess reservation status for various purposes, despite the Oneida's inability to exercise full sovereign authority over those lands (*see e.g. Oneida Indian Nation of N.Y. v Madison County*, 401 F Supp 2d 219 [ND NY 2005], *affd* 605 F3d 149, 157 n 6 [2d Cir 2010] [Second Circuit noted that its prior holding in *City of Sherrill* concluding that the Oneida reservation was never disestablished was not disturbed by the Supreme Court and "therefore remains the controlling law of this circuit"]). Although *City of Sherrill* certainly would preclude the Cayuga Nation from attempting to assert sovereign power over its convenience store properties for

the purpose of avoiding real property taxes,[11] the decision simply does not establish that the convenience stores are not located on a reservation recognized by the United States government.

The DAs argue that realty cannot be ascribed reservation status if the Indian nation cannot fully exercise sovereign power over it. But *City of Sherrill* suggests exactly the opposite. The Supreme Court expressly declined to reach the issue of whether the Second Circuit erred in concluding that the Oneida reservation had not been disestablished; the Court assumed that the property reacquired by the tribe was reservation property but nonetheless held that the Oneida Nation could not unilaterally exert sovereign authority over it for purposes of avoiding real property taxes.

And Tax Law § 470 (16) itself makes a distinction between reservation property and property over which an Indian nation or tribe has sovereign authority. Paragraph (a) on which the Cayuga Nation relies refers to land held by an Indian nation within the "reservation" of that nation, without any reference to the tribe's ability to exercise sovereign power over that land. In contrast, sovereign authority is addressed in paragraph (b), which defines "qualified reservation" as including "[l]ands within the state *over which an Indian nation or tribe exercises governmental power*" (Tax Law § 470 [16] [b] [emphasis added]). Thus, the Tax Law distinguishes between one type of "qualified reservation" land over which a tribe exercises governmental power (paragraph [b]) and another which has been ascribed "reservation" status under federal law (paragraph [a]). This is consistent with the federal statutes authorizing the United States to hold property in trust for an Indian tribe, a process that results in the tribe being able to exercise some measure of sovereign authority over recently acquired lands, whether they were or were not a part of its aboriginal reservation. If property is not a reservation unless the tribe can exercise governmental authority over it as the DAs maintain, then it would have been unnecessary to include paragraph (a) since all reservation property would fall within paragraph (b)'s "governmental power" provision.

Our conclusion that the Nation's convenience store properties meet the definition of "qualified reservation" in Tax Law § 470

---

11. The Cayuga Indian Nation acknowledges its obligation to pay real property taxes and comply with local zoning and land use laws on these parcels and it is undisputed that the Nation has, to date, fulfilled those obligations.

(16) (a) is also consistent with the legislative history of that provision. As the DAs correctly point out, the Supreme Court issued its decision in *City of Sherrill* before Tax Law § 470 (16) (a) was approved. Thus, the fact that the Supreme Court had recognized that an Indian nation might possess reservation property over which it could not exercise aspects of its traditional sovereign power would have been known to the Legislature at the time the statute was enacted. Yet the Legislature nevertheless adopted a statute that distinguishes between reservation land and property over which Indian nations exercise governmental power—and crafted a definition of "qualified reservation" that encompassed both.

In addition, it is notable that the Legislature chose to include in Tax Law § 470 (16) (a) a general definition of qualified reservation that does not reference specific tribes. This was a departure from the approach that had been taken by the Department in a 1982 general tax exemption regulation, which contained a list of tribes with recognized Indian reservations that did not include the Cayuga Indian Nation (*see* 20 NYCRR 529.9 [a] [2]).[12] Although the DAs suggest that this omission is evidence that the Department does not recognize reacquired property as having reservation status,[13] we do not find the omission to bear that significance given that, at the time the regulation was promulgated, the Nation did not possess fee title to any property in this state, having not yet reacquired any parcel of its aboriginal reservation.[14]

---

**12.** Since 1976, however, the Nation has been listed as a tax-exempt organization in Tax Law § 1116 (a) (6), the regulation's enabling statute.

**13.** Based on the regulations proposed in February 2010, it appears that the Department of Taxation and Finance now recognizes that properties reacquired by the Nation in the past decade can have reservation status as the regulations include the Cayuga Indian Nation among the list of tribes for whom "the probable demand of the qualified Indians on the nation's or tribe's qualified reservation" must be calculated and makes a preliminary calculation of the Nation's probable demand (20,100 packs of cigarettes per quarter) (*see* proposed 20 NYCRR 74.6 [f] [2] [i]). Since the Nation owned no property in New York prior to 2003, the inclusion of the Nation in this regulation can only be interpreted as an acknowledgment that recently acquired property can meet the definition of "qualified reservation" in Tax Law § 470 (16), as we have concluded.

**14.** The Legislature appears to have made a considered decision, when adopting the definition of "qualified reservation" for purposes of the 2005 legislation, not to follow the approach previously taken by the Department in the 1982 regulation; rather than listing all the tribes that had reservations in New York, it enacted a general definition that borrowed language from IGRA,

The DAs further rely on the definition of "qualified Indian" in Tax Law § 470 (15) in support of their argument that the convenience stores are not located on a "qualified reservation." This term, intended to identify Indians who can purchase cigarettes tax free under the collection mechanism in Tax Law § 471-e, defines "qualified Indian" to include: "A person duly enrolled on the tribal rolls of one of the Indian nations or tribes. In the case of the Cayuga Indian Nation of New York, such term shall include enrolled members of such nation when such enrolled members purchase cigarettes on any Seneca reservation" (Tax Law § 470 [15]). In their view, this provision represents an explicit recognition by the Legislature that the Cayuga have no reservation land of their own and therefore negates the argument that the reacquired parcels can constitute Cayuga reservation land under Tax Law § 470 (16) (a). We are unpersuaded.

Tax Law § 470 (15) accounts for the fact that, until 2003, the Cayuga Nation did not own any land in New York and many of the Cayuga live on the Seneca reservation. Thus, the statute is a narrow accommodation to those Cayuga members that allows them to buy cigarettes tax free on the reservation where they reside, even though the general rule is that Indians may purchase tax-free items only on the reservation of their own nation or tribe. Since Tax Law § 470 (15) neither defines nor addresses the term "reservation," it does not support the DAs' argument that the term does not embrace land that is recognized as such by the United States government.[15]

---

a federal statute, to identify the properties that would constitute a "qualified reservation" for purposes of the collection of cigarette sales taxes emanating from sales by Indian retailers. For this reason, we reject the DAs' argument that the Cayuga Indian Nation cannot be viewed as having a reservation under Tax Law § 470 (16) under the definition adopted by the Legislature because a 1982 regulation drafted by the Department at a time when the Nation owned no property in New York did not recognize such a reservation.

15. The argument that reservation status is negated by Tax Law § 470 (15) is further undermined by section 470 (14), also adopted in the 2005 legislation. Section 470 (14) includes the Cayuga Indian Nation within the definition of an "Indian nation or tribe." Since that definition, along with the others we have discussed, was intended to facilitate enforcement of Tax Law § 471-e—a statute that exclusively addresses the collection of sales taxes for retail cigarette purchases occurring on "qualified reservations"—the inclusion of the Cayuga Indian Nation among the tribes impacted by the 2005 legislation further supports our conclusion that the Legislature did not intend to exclude property owned by the Nation from the definition of "qualified reservation" adopted in Tax Law § 470 (16) (a).

In response to the argument that our interpretation of Tax Law § 470 (16) (a) will impact the meaning of the term "reservation" in other statutes, such as Indian Law § 6 or Real Property Tax Law § 454, we emphasize that—as is usually the case when we construe the language in a statute—our analysis applies only to the statute we are currently charged with interpreting. As explained above, Tax Law § 470 (16) was, in part, patterned after a federal statute and was adopted after the Supreme Court decided *City of Sherrill*, at a time when the Legislature was aware that reservation status and sovereign authority are not necessarily coextensive. And our interpretation of the term "reservation" in this case turns not only on the wording but on the structure of the statute—e.g., the inclusion of paragraph (b) distinctly addressing an Indian nation's exercise of "governmental power" over a parcel—and the other historical and contextual factors we have discussed. The statutes cited by the DAs appear in other chapters of the consolidated laws, were adopted at different times and have their own distinct structures and legislative histories. We express no view on the meaning of provisions that are not before us for review, other than to note that terms found in Tax Law § 470 (16) (a) will not necessarily be accorded the same meaning when they appear in other statutory contexts.[16]

## V. Reliance on Tax Law § 471 to enforce sales tax collection obligations against Indian retailers

The DAs do not dispute that, if the convenience store properties are located on a "qualified reservation," Nation retailers may sell untaxed cigarettes to members of the Nation on those properties. But they contend that, even assuming the properties have "qualified reservation" status under New York law, Tax Law § 471 imposes a sales tax on cigarettes sold by Indian retailers to non-Indians and this can be enforced against the Nation, notwithstanding the fact that the tax exemption coupon system devised by the Legislature in Tax Law § 471-e is not in effect.

---

**16.** The dissent does not offer an alternate interpretation of Tax Law § 470 (16) but instead asserts that the statute is without "legal significance" because it defines terms found in Tax Law § 471-e, a statute that is not in effect (dissenting op at 655). The DAs did not propose this view of the statute. They argued that the term "qualified reservation" had an established meaning under state law based on Department regulations and publications issued before the statute was adopted, contending that the Department had excluded the Nation from the list of tribes with reservation property in New York. They further relied on Tax Law § 470 (15)—a subdivision enacted in the same legislation that also defines terms used in Tax Law § 471-e.

 The Nation responds that, regardless of whether Tax Law § 471 "imposes" a tax, there is currently no mechanism in New York law for determining how much sales tax is due in relation to retail sales that occur on an Indian reservation, how much non-taxed inventory can be maintained and what process will be used for collecting the taxes due from Indian retailers, while simultaneously respecting their federally protected right to make tax-free sales to tribal members. Since Tax Law § 471-e, which was designed for this purpose, is not enforceable and the Department has not formally adopted regulations or otherwise implemented such a system, the Nation maintains that Indian retailers cannot be criminally prosecuted for noncompliance with the laws governing sales taxes. We agree with the Nation.

There is no question that Tax Law § 471 generally imposes a sales tax on cigarettes sold in New York. The statute declares: "There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax . . . ." (Tax Law § 471 [1].) The statute further discloses the amount of the tax, currently $2.75 per 20-cigarette pack. The issue here is not whether Tax Law § 471 (1) "imposes" a sales tax—or, as the dissent might frame it, whether the State has the power to tax cigarette sales to non-Indians. Rather, the question is how the tax is to be assessed and collected in the unique retail context presented here and from whom.

The ultimate obligation to pay cigarette sales taxes rests on the consumer, although in most cases that duty is fulfilled, consistent with the tax stamping scheme, by payment of the tax to the retailer, who passes it up to the distributor and wholesaler, who remits it to the Department through the purchase of tax stamps. If, for any reason, a sales tax that is properly owed is not collected in this manner, the consumer remains under the obligation to remit it through other means (see Tax Law § 471; Tax Law § 471-a [imposing a "use tax" on cigarettes used in New York for which sales taxes were not paid]).[17]

Thus, the issue in this case is not whether sales taxes are due when non-Indian consumers purchase cigarettes from Indian

---

**17.** In fact, Tax Law § 1112 (1) specifically addresses the payment by consumers of taxes emanating from goods purchased on Indian reservations:

"Where property or services subject to sales or compensating use tax have been purchased on or from a qualified Indian reservation . . . , the purchaser shall not be relieved of his or her

retailers—they are. The issue is whether Indian retailers can be criminally prosecuted for failing to collect the sales taxes from consumers and forward them to the Department. In the absence of a methodology developed by the State that respects the federally protected right to sell untaxed cigarettes to members of the Nation while at the same time providing for the calculation and collection of the tax relating to retail sales to non-Indian consumers, we answer this question in the negative.

We begin with the observation that the Legislature itself concluded that a system—either in statutory or regulatory form—must be adopted before Indian retailers are required to act as intermediaries for the collection of state cigarette sales taxes.[18] This is not surprising since, in our decision in *Matter of New York Assn. of Convenience Stores*, we noted that the 1988 regulations—which had been repealed—"provided the only regulatory framework for enforcing the . . . cigarette taxes on Indian reservations" (92 NY2d at 214). In the absence of another collection mechanism tailored to on-reservation retail sales, the repeal of the regulations "signified that the Tax Department [had] committed itself to withholding active enforcement on a long-term basis" (*id.*). Quoting from the Department's explanation for the repeal, we clarified that "the repeal . . . does not eliminate the statutory liability for taxes as they relate to sales on Indian reservations to nonexempt individuals" (*id.*)—a point that we reaffirm today. Although non-Indian consumers remained obligated to pay the taxes, the 1998 repeal of the regulations resulted in the annulment of an authorized method for calculating and collecting that tax from Indian retailers.

---

liability to pay the tax due. Such tax due and not collected shall be paid by the purchaser directly to the department."
The statute not only declares that the tax is owed but directs how it may be paid, stating that consumers can account for the taxes on their personal income tax forms. Like Tax Law § 470 (16), Tax Law § 1112 was amended in the 2005 legislation amending Tax Law § 471-e. But no claim has been made that the statute is not "in effect," nor—unlike section 471-e—would it have been necessary for the Department to take any actions prior to implementation of its provisions.

18. Likewise, after the Supreme Court decided *Moe* in 1976 announcing that it was permissible for states to collect sales taxes relating to purchases by non-Indian consumers on reservations, the Department did not immediately attempt enforcement efforts based on Tax Law § 471. Rather, it adopted regulations in 1988 tailored to specifically address the calculation and collection issues presented by such sales.

This was the void the Legislature intended to fill in 2003 when it passed the initial version of Tax Law § 471-e directing the Department to promulgate whatever "rules and regulations necessary to implement the collection of sales, excise and use taxes on . . . cigarettes or other tobacco products" purchased by non-Indian consumers on reservation property (former Tax Law § 471-e, added by L 2003, ch 62, part T3, § 4, as amended by L 2003, ch 63, part Z, § 4). When the Department failed to do so, the Legislature amended Tax Law § 471-e to incorporate a tax exemption coupon system for the calculation and collection of sales taxes. The Legislature attempted to accomplish the same result in 2004 but the bill amending Tax Law § 471-e was vetoed by the Governor. Although the Bill Jacket for the 2005 legislation does not contain a sponsor's memorandum, the sponsor's memorandum for the 2004 legislation emphasized that the purpose of the amendment was to "[p]rovide[ ] for the taxation of cigarettes . . . on qualified Indian reservations when sold to non-Indians" (Sponsor's Mem, 2004 NY Senate Bill S6822-B, Veto Jacket, Veto 265 of 2004, at 8). Since the Department failed to heed the direction in the 2003 legislation "to put a system in place to collect non-Indian taxes," the Legislature acted in 2005 by incorporating the Department's draft regulations into the statute (id. at 9). The sponsor further explained that the Legislature understood and intended to respect Native American sovereignty and to "assure that Native Americans who purchase cigarettes . . . on reservations continue their tax exempt status" (id. at 10). To that end, the system had been designed so that the State could "collect these taxes at the distributor level before [the cigarettes] are transported onto the reservation" subject to a subsequent tax rebate that accounted for the right of Indians to make tax-free purchases (id. at 9-10).

Based on the 2003 and 2005 legislation, it is clear that the Legislature did not view Tax Law § 471 as a sufficient regulatory or statutory predicate for the collection of sales taxes from Indian retailers. Nor would a system of ad hoc enforcement by local District Attorneys, without implementation of an appropriate calculation and collection methodology, be consistent with legislative intent. The Legislature acknowledged that Indian nations and tribes, and their members, enjoy a federal tax exemption. It expressed a sensitivity to the enforcement issues presented in the context of on-reservation sales, even emphasizing that its system allowed the State to collect taxes "at the distributor level," rather than pursuing enforcement directly from

Indian retailers. It is hard to imagine an approach more inconsistent with the tack taken by the Legislature than a system that depends on criminal prosecutions of individual Indian retailers or their employees as the primary enforcement mechanism.

Moreover, in *Milhelm*, the United States Supreme Court analyzed the tax collection scheme that had been implemented in some detail to assess whether it was "unduly burdensome" (512 US at 76).[19] It discussed the "probable demand" approach embodied in the 1988 New York regulations, noting that the system was permissible on its face, while cautioning that it could be subject to challenge if the Department's calculation of "probable demand" was inadequate and failed to account for legitimate tax-exempt sales. And it specifically approved one feature of the 1988 regulations—that the State was not permitted to precollect taxes on cigarettes that were ultimately the subject of tax-exempt sales. The careful analysis undertaken by the Supreme Court in *Milhelm* would have been unnecessary if no specialized mechanism is needed to apply a general tax stamping scheme to sales by Indian retailers.

To decide otherwise is to create a system of ad hoc enforcement of cigarette sales tax laws by county prosecutors. In the absence of an overarching methodology devised by the Legislature or the Department for adapting the tax scheme to the unique context of qualified reservation sales, a District Attorney would be in a position to decide—after the fact—what actions the Indian retailer should or could have taken to comply with the statute. Indeed, in the context of this case, the DAs have changed their position regarding what an Indian retailer might do to avoid criminal prosecution for noncompliance with Tax Law § 471's general requirements. Initially, they proposed that the entire inventory of cigarettes held by Indian retailers would need to display tax stamps (a position consistent with Tax Law § 471, which precludes the possession of unstamped cigarettes), suggesting that a retailer might be able to seek refunds from the Department for tax-exempt sales made to tribal members.

---

**19.** The dissent suggests that *Milhelm* was decided based on principles of Indian sovereignty (dissenting op at 655-656). But this is not the case. In *Milhelm*, non-Indian wholesalers challenged the 1988 regulations as preempted by federal Indian trader statutes. The Court made clear that its decision did not address other concerns, such as how New York's scheme "might affect tribal self-government or federal authority over Indian affairs" (*Milhelm*, 512 US at 69).

Yet, the DAs did not explain how the Department was to assess the validity of refund claims based on sales that had already occurred, absent a tax exemption coupon system or some other Department-sanctioned tracking method.

Later, the DAs contended that Indian retailers might be able to maintain an inventory of untaxed cigarettes to sell to tribe members. In their brief in this Court they state that "an Indian group or tribe can readily comply with the Tax Law by selling its allotment of unstamped cigarettes to its own members by using their existing identification cards" (Defendants' Brief at 38). Of course, the crux of the problem is that there is no way for Indian retailers (or anyone else) to know what the State-sanctioned inventory "allotment" is (or how to acquire it)—and, therefore, how many unstamped cigarettes a retailer may lawfully possess—absent a method such as the "probable demand" system for making that determination. In this milieu of uncertainty, the Indian retailers would bear the burden of proving that their inventory of untaxed cigarettes was necessary to serve the needs of Indian purchasers. It appears that retailers would be allowed to raise this as an affirmative defense—to be offered at the election of a District Attorney since no such defense appears in Tax Law § 471 (or anywhere else in the Tax Law or Penal Law). Under this proposed methodology, in order to make tax-free sales to tribal members as permitted by federal law, Indian retailers would have to run the risk—and bear the costs (both monetary and otherwise)—of criminal prosecution in the hope that a jury would ultimately credit their view of the evidence.

Not only are these approaches impractical, but we doubt that they would comply with the United States Supreme Court's requirement that a sales tax collection scheme involving Indian retailers be not "unduly burdensome." Even outside the context of Indian relations, taxpayers are not ordinarily required to guess what they need to do to comply with the Tax Law. It is generally up to the Legislature and the Department to articulate—before a transaction occurs—in what circumstances a tax is owed, who is obligated to collect it, how it should be calculated and when and how it must be paid. Whatever methodology is ultimately used to calculate and collect sales taxes derived from on-reservation retail sales of cigarettes, we would expect that advance notice would be supplied to Indian retailers and that the system would be uniform throughout the state. The approaches suggested here do not meet these minimal requirements.

The DAs' reliance on *Snyder v Wetzler* (84 NY2d 941 [1994], *affg* 193 AD2d 329 [3d Dept 1993]) for the proposition that, standing alone, Tax Law § 471 provides an adequate method for the calculation and collection of sales taxes from Indian retailers is misplaced. In 1993, at a time when the 1988 regulations had not yet been repealed (although they had been stayed as a result of the ongoing *Milhelm* litigation), a member of the Seneca Nation initiated an action seeking a general declaration "that the State was without power to impose or collect taxes on [cigarette] sales made within the Indian reservation" (193 AD2d at 330). This Court rejected that argument, noting that the

> "United States Supreme Court has clearly established that State tax statutes requiring Indian retailers to collect and remit taxes on sales to non-Indian purchasers, and to keep the records necessary to ensure compliance, violate neither the Commerce Clause nor the constitutional proscription against direct taxation of Indians absent explicit congressional consent" (84 NY2d at 942).

Contrary to the DAs' suggestion, Tax Law § 471 was not discussed in the *Snyder* decision nor, in any event, could the same issues relating to its enforcement have been resolved since, at that time, the Department had formally promulgated and was actively seeking to enforce regulations addressing the complicated calculation and collection issues arising from on-reservation sales. *Snyder* does nothing more than reaffirm the general principle articulated in *Moe* (which was subsequently reaffirmed in *Milhelm*) that states can collect sales taxes for goods sold to non-Indians on reservation properties if they devise and implement an appropriate mechanism for doing so.

The federal decisions on which the DAs depend are also inapposite as most do not involve on-reservation retail sales of cigarettes to consumers for their personal use but arose from large-scale cigarette bootlegging activities engaged in by Indian and non-Indian traders. For example, *United States v Kaid* (241 Fed Appx 747 [2d Cir 2007]) is a criminal case against a defendant charged with violating the federal crime of trafficking in contraband cigarettes. The defendant claimed that, since New York does not enforce its laws imposing taxes on retail sales to non-Indians on reservations, the cigarettes he possessed and resold were not contraband within the meaning of the federal statute. The Second Circuit disagreed, noting:

> "While it appears that New York does not enforce

its taxes on small quantities of cigarettes purchased on reservations for personal use by non-native Americans, nothing in the record supports the conclusion that the state does not demand that taxes be paid when, as in this case, massive quantities of cigarettes were purchased on reservations by non-Native Americans for resale" (*id.* at 750).

As is evident from *Kaid*, the complex calculation and collection issues raised when a state attempts to collect sales taxes from Indian retailers (such as determining which cigarettes possessed for potential sale must contain tax stamps and which need not, and which sales are exempt from taxation because they involve Indian consumers and which are not) are not present when a wholesaler or distributor, whether Indian or otherwise, makes a bulk sale of cigarettes to a party that intends to resell them off the reservation. The federal tax exemption applies only to on-reservation sales to Indians for their personal use—there is no exemption allowing Indians to engage in the wholesale distribution of untaxed cigarettes destined for off-reservation sales. Thus, the exemption is not implicated when conduct of the type at issue in *Kaid* is alleged and no special calculation or collection mechanism like the system set forth in Tax Law § 471-e is necessary because not a single pack of cigarettes involved in such a transfer would be tax exempt. Thus *Kaid* and the other federal cigarette bootlegging cases cited by the DAs (*see e.g. City of New York v Golden Feather Smoke Shop, Inc.* [2009 WL 705815, 2009 US Dist LEXIS 20953 (ED NY 2009), *question certified to NY Ct App* 597 F3d 115 (2d Cir 2010); *United States v Morrison*, 596 F Supp 2d 661 (ED NY 2009)]) are distinguishable as they do not raise the same issues concerning collection of sales taxes from Indian retailers based on sales to individual consumers as presented in this case.

In sum, although Tax Law § 471 certainly "imposes" a cigarette sales tax, we conclude that the Cayuga Nation is entitled to a declaration that the absence of an appropriate legislative or regulatory scheme governing the calculation and collection of cigarette sales taxes that distinguishes between federally exempt retail sales to Indians occurring on a "qualified reservation" and non-exempt sales to other consumers precludes reliance on Tax Law § 471 as the sole basis to sanction Nation retailers for alleged noncompliance with the New York Tax Law.

Contrary to the dissent's suggestion otherwise, we are not relying on Tax Law § 471-e as the basis for this conclusion. We

have assumed, for purposes of this appeal, that section 471-e is not in effect—if that statute was enforceable, there would be a statutory method for calculating and collecting the taxes generated by the Nation's retail sales at its convenience stores. Nor do we claim that section 471-e has created a tax exemption. The restrictions that limit the State's efforts to collect cigarette taxes from Indian nations or their members in this context are derived from federal law and this prompted the Legislature to address the need for a specialized tax collection scheme by adopting Tax Law § 471-e. Since section 471-e was never operative, and no other comparable statutory or regulatory scheme has filled that gap, the Nation is entitled to declaratory relief.

Accordingly, the order of the Appellate Division should be modified by granting judgment declaring in accordance with this opinion and, as so modified, affirmed, with costs to the plaintiff. The certified question should be answered in the negative.

PIGOTT, J. (dissenting). In my view, the State has validly imposed both a tax obligation on the cigarettes sold by the Cayuga Nation to the public and a mechanism by which those taxes are to be collected under Tax Law § 471. Because the Nation has admittedly refused to fulfill its collection and remittance obligations under the statute, the sale of unstamped cigarettes from the Nation's two convenience stores is properly a subject for criminal prosecution. Accordingly, I respectfully dissent.

New York's Tax Law § 471 imposes a cigarette excise tax. That provision applies to all cigarettes possessed in the state for sale, except that "no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax" (§ 471 [1]). Tax Law § 471 (2) sets forth the mechanism for the collection of the taxes imposed by the State on the cigarette sales. Specifically, a State-licensed stamping agent is required to advance the amount of the tax by purchasing stamps from the State and affixing them to each package of cigarettes. The stamp cost is built into the cost of the cigarettes and is passed along to the consumer (§ 471 [3]). The penalty for a violation of the taxing statute is found in Tax Law § 1814, which provides that any person who "willfully attempts in any manner to evade or defeat the taxes imposed [on cigarette sales] . . . . shall be guilty of a class E felony" (§ 1814 [a]). Thus, pursuant to this section of New York's Tax Law, all cigarettes that

the State has the power to tax are required by law to be stamped.

It is undisputed that the State has the power to tax a majority of the Nation's cigarette sales—those cigarettes sold to non-Indians (*see Department of Taxation & Finance of N.Y. v Milhelm Attea & Bros.*, 512 US 61, 64 [1994] [explaining that "(o)n-reservation cigarette sales to persons other than reservation Indians, however, are legitimately subject to state taxation"]). The Nation contends, however, that the State does not have the power to tax *any* of its cigarette sales because the Tax Department has not implemented the coupon system adopted in section 471-e of the Tax Law.

Section 471-e requires (as does section 471) that all cigarettes sold on an Indian reservation to non-Indians be taxed, and evidence of such tax will be by means of an affixed cigarette tax stamp (§ 471-e [1] [a]). The provision also includes a tax exemption: "qualified Indians may purchase cigarettes for such qualified Indians' own use or consumption exempt from cigarette tax on their nations' or tribes' qualified reservations" (*id.*). It is acknowledged, however, that section 471-e of the Tax Law is not in effect.* Therefore, contrary to the belief of my colleagues in the majority, it provides no basis for immunity from New York's cigarette tax laws.

The majority further argues that the Nation can rely on the plain language of Tax Law § 470 (16) as a basis for its statutory exemption. That provision, however, is under the definition section of the Tax Law, and defines the term "qualified reservation": a term used only in section 471-e, which the parties concede is not in effect. Thus, section 470 (16) merely defines a term whose meaning, unless and until section 471-e becomes effective, has no legal significance.

Without section 471-e's statutory tax exemption in effect, the Nation may not foreclose the State from imposing and collecting taxes on cigarettes sold at the stores. Although the Nation cites to a number of cases which have held that a state cannot tax on-reservation cigarette sales to members of the

---

* The Legislature provided that the amended version of Tax Law § 471-e "shall take effect March 1, 2006, provided that any actions, rules and regulations necessary to implement the provisions of [the statute] on its effective date are authorized and directed to be completed on or before such date" (L 2005, ch 63, part A, § 4). In *Day Wholesale, Inc. v State of New York* (51 AD3d 383 [4th Dept 2008]), the Appellate Division concluded that the amended version of Tax Law § 471-e was not "in effect" based on the failure of the Department of Taxation and Finance to take action to implement that statute by issuing necessary coupons. Because the parties do not challenge that holding on this appeal, I assume, for purposes of this appeal, the correctness of the decision.

reservation's governing tribe for their own use, those cases were decided under the principles of Indian sovereignty (*see e.g. Department of Taxation & Finance of N.Y. v Milhelm Attea & Bros.*, 512 US 61, 64 [1994]; *Moe v Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 US 463 [1976]), and in the wake of the United States Supreme Court's decision in *City of Sherrill*, are irrelevant to any claim by the Nation. In *City of Sherrill v Oneida Indian Nation of N. Y.* (544 US 197 [2005]), the Supreme Court concluded that an Indian Nation cannot unilaterally revive its ancient sovereignty, in whole or in part, over later-acquired parcels (544 US at 214). Thus, as even the majority recognizes, the Nation may not assert sovereign authority over its store properties for the purpose of avoiding taxes (*see e.g.* majority op at 642-643).

Even assuming that the statutory immunity provided for under section 471-e was in effect and was applicable to the Nation, the statute by its very language still requires that all cigarettes sold on an Indian reservation to non-Indians be taxed, and evidence of such tax will be by means of an affixed cigarette tax stamp (Tax Law § 471-e [1] [a]). Although section 471-e would alter the collection mechanism imposed on the Nation for cigarettes sold to its Indian members, it would in no way alter the tax obligation of the Nation for cigarettes sold to non-Indians (*see Matter of New York Assn. of Convenience Stores v Urbach*, 92 NY2d 204, 214 [1998] ["the repeal (of the regulations that preceded the enactment of section 471-e) does not eliminate the statutory liability for taxes as they relate to sales on Indian reservations to nonexempt individuals"]).

Simply put, the lack of implementing regulations under section 471-e, a statutory provision that is not in effect, does not affect the tax obligation of the Cayuga Nation to sell only tax-stamped cigarettes. Consequently, I would vote to reverse the order of the Appellate Division and answer the certified question in the negative.

Chief Judge LIPPMAN and Judges CIPARICK and JONES concur with Judge GRAFFEO; Judge PIGOTT dissents and votes to reverse in a separate opinion in which Judges READ and SMITH concur.

Order modified, etc.