The CITY OF NEW YORK, Plaintiff,

v.

Robert GORDON, Marcia Gordon, Regional Integrated Logistics, Inc., Defendants.

12–CV–4838 (VSB)

United States District Court, S.D. New York.

Signed December 10, 2015

415

Aaron Michael Bloom, Eric Proshansky, New York City Law Department, New York, New York, Counsel for Plaintiff

### MEMORANDUM & ORDER

VERNON S. BRODERICK, United States District Judge:

Plaintiff the City of New York (the "City") brings this action against Defendants Robert and Marcia Gordon (together, the "Gordon Defendants") and Regional Integrated Logistics, Inc. ("RIL"), seeking injunctive relief, penalties, and damages for violations of the Prevent All Cigarette Trafficking Act ("PACT Act"), 15 U.S.C. § 375 *et seq.*; the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 *et seq.*; the Cigarette Marketing Standards Act, N.Y. Tax L. § 483 *et seq.*; and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* The City has settled its claims against the Gordon Defendants.

Before me is the City's unopposed summary judgment motion against RIL (the "Motion"). Because I conclude that the City's theory of liability is legally valid and supported by admissible record evidence, the City's Motion is GRANTED in part. However, because the City's theory of damages is lacking in admissible evidentiary support, the City's Motion is DENIED with respect to damages.

## I. Background [1]

The City and the State of New York (the "State") each impose a separate excise tax on all cigarettes possessed for sale or use in their respective jurisdictions. N.Y. Tax L. §§ 471(1), 471–A; N.Y.C. Admin. Code § 11–1302(a)(1). (*See also* P's 56.1 ¶ 3.) [2] Those taxes must be pre-paid, the proof of which is a stamp affixed to each package of cigarettes, N.Y. Tax. L. § 471(1); N.Y.C. Admin. Code §§ 11–1302(e), (g), (h), (i); hence, "unstamped" cigarettes are untaxed cigarettes. [3] (P's 56.1 ¶¶ 4–5.) The City's basic allegation is that RIL and the Gordon Defendants, who operated a cigarette business on a Seneca Nation of Indians ("SNI") reservation, were part of a continuing enterprise or series of enterprises that transported untaxed cigarettes into the City. (*See, e.g.,* P's Mem. 2; Am. Compl. ¶¶ 2–4.) [4]

In the mid–2000s, a group of mail carriers—the United Parcel Service ("UPS"), DHL, and Federal Express—stopped shipping cigarettes to consumers. (*Id.* ¶ 16; *see also* Bloom Decl. Ex. 6, ¶ 31.) [5] The United States Postal Service (the "Postal Service"), however, continued to do so. (P's 56.1 ¶ 16; Bloom Decl. Ex. 6, ¶¶ 31, 35.) In 2010, Congress passed the PACT Act, which among other things bars the Postal Service from shipping cigarettes. 18 U.S.C. § 1716E(a)(1). (*See also* P's 56.1 ¶ 17.) The PACT Act also prohibits remote sales of cigarettes unless applicable state and local taxes are paid in advance. 15 U.S.C. §§ 376a(a)(3)–(4), (d). (*See also* P's 56.11 ¶ 17.) In a separate lawsuit, Defendant Robert Gordon challenged the PACT Act and won a preliminary injunction against the tax provisions—the provisions barring remote sales of cigarettes without advance payment of state and local taxes—on due process grounds, but not against the ban on mailing cigarettes. *See Gordon v. Holder,* 826 F.Supp.2d 279 (D.D.C.2011), *aff'd* 721 F.3d 638 (D.C.Cir. 2013). [6] The preliminary injunction was based on Gordon's argument that nonresident tobacco retailers could not be subjected to state and local taxes without regard to their contacts with the taxing jurisdiction. *Id.* at 288–293.

In August 2010, RIL began to assist SNI smoke shops in shipping untaxed cigarettes to various locations, including to New York City. (P's 56.1 ¶¶ 27.) RIL

---

**1.** The facts described in this section are presented for background purposes. I have examined the City's submissions to determine whether they are supported by the facts in the record and, to the extent discussed below, conclude that the submissions are supported by the facts in the record.

**2.** "P's 56.1" refers to the City of New York's Rule 56.1 Statement of Material Undisputed Facts. (Doc. 113.)

**3.** For purposes of this Memorandum and Order, I use the terms "unstamped" and "untaxed" interchangeably.

**4.** "P's Mem." refers to the Memorandum of Law of Plaintiff the City of New York in Support of its Motion for Summary Judgment. (Doc. 112.) "Am. Compl." refers to the Amended Complaint. (Doc. 32.)

**5.** "Bloom Decl." refers to the Declaration of Aaron M. Bloom in Support of Plaintiff's Motion for Summary Judgment against Defendant Regional Integrated Logistics, Inc., d/b/a Regional Parcel Services. (Doc. 115.)

**6.** An additional case. *Red Earth LLC v. United States,* reached a similar result. *See* 728 F.Supp.2d 238, 260 (W.D.N.Y.2010). That case was later dismissed by the parties and the preliminary injunction was vacated. *Red Earth,* No. 10–CV–687, Dkt. 105 (June 6, 2013). On March 26, 2015, Robert Gordon's lawsuit was dismissed as moot because the Gordon Defendants were no longer in the cigarette business. *See Gordon v. Holder,* 85 F.Supp.3d 78, 79–80 (D.D.C.2015). In light of the mootness determination, the Court also vacated the preliminary injunction. *Id.* at 85.

picked up packages containing cartons of cigarettes from smoke shops on SNI reservations, transported the packages to its warehouse in Buffalo, New York, sorted the packages, and arranged for the packages to be shipped to courier services that made final delivery of the packages to residential addresses. (*Id.* ¶¶ 37–40; Hale Dep. 36–37, 184.)[7] RIL continued to undertake these activities until early June 2013, when this Court issued an injunction barring it from doing so, (Doc. 75). The City seeks to recover the taxes it lost from in or about August 2010 up to in or about June 2013. (*See* P's Mem. 1.)

## II. *Procedural History*

The City filed its Complaint on June 20, 2012. (Doc. 1.) The Gordon Defendants, who were represented by counsel at the time, filed a motion to dismiss and supporting papers on September 7, 2012. (Docs.19–22.) By Order dated September 10, 2012, Judge Jesse M. Furman,[8] to whom this case was initially assigned, directed Plaintiff to file an amended complaint by September 28, 2012, and Defendants to either file an answer, new motions to dismiss, or a letter indicating their intention to rely on their previously filed motions to dismiss by three weeks after the filing of the amended complaint. (Doc. 24.) Defendant RIL filed a motion to dismiss and supporting papers on September 10, 2012. (Docs.25–27.)[9] The City filed a motion for a preliminary injunction and supporting papers on September 28, 2012. (Docs.28–31.) As directed by Judge Furman, the City filed its amended complaint the same day, (Doc. 32), and the

Gordon Defendants and RIL filed renewed motions to dismiss and supporting papers on November 30, 2012, (Docs.37, 42). Counsel to the Gordon Defendants was granted permission to withdraw by Order dated March 25, 2013. (Doc. 65.)

On May 21, 2013, Judge Furman entered an Order denying both motions to dismiss and granting the City's motion for a preliminary injunction. (Doc. 70; *see also City of New York v. Gordon,* 1 F.Supp.3d 94, 98 (S.D.N.Y.2013).) Judge Furman entered injunctions against RIL on June 3, 2013, (Doc. 75), and against the Gordon Defendants on June 6, 2013, (Doc. 78).

The Gordon Defendants submitted a letter, received by the Court's Pro Se Office on June 14, 2013, indicating that they could not obtain legal representation and did not intend to represent themselves. (*See* Doc. 84.) By endorsement, Judge Furman ordered the Gordon Defendants to submit an additional letter clarifying their intentions with regard to the lawsuit. (*Id.*) They did not do so. The case was reassigned to Judge Ramos, and on December 5, 2013, Judge Ramos granted the City leave to file an Order to Show Cause for a default judgment against the Gordon Defendants. (Doc. 92.) On December 30, 2013, RIL filed a notice of its petition for Chapter 11 bankruptcy, (Doc. 93), and on January 14, 2014, Judge Ramos stayed this case with respect to RIL pending resolution of the bankruptcy proceedings, (Doc. 95). Judge Ramos permitted the City to proceed against the Gordon Defendants for a default judgment, (*see* Doc. 97), and on February 3, 2014, the City requested

---

7. "Hale Dep." refers to the transcript of the September 19, 2013 deposition of Michael J. Hale. (Doc. 115–1.)

8. The case was reassigned to Judge Edgardo Ramos on July 17, 2013, and again to me on January 30, 2014.

9. RIL attempted to file its motion to dismiss on September 7, 2012, but various filing errors prevented the motion and supporting papers from being filed on that date.

that the Clerk enter default, (Doc. 98). On April 1, 2014, the City reported that RIL's bankruptcy case had been dismissed and requested permission to proceed with its motion for summary judgment. (Doc. 102.) On April 3, I issued an order lifting the stay of this case and setting a briefing schedule on the City's motion.

On April 8, 2014, I entered an Order for the Gordon Defendants to show cause why a default judgment should not be entered against them. (Doc. 105.) The City appeared for the show cause hearing on April 28, 2014, but the Gordon Defendants did not appear or request an adjournment. Instead, Marcia Gordon submitted a letter suggesting that the Gordon Defendants did not receive timely notice of the Order because they had moved out of state. (Doc. 117.) Following a telephone conference with Marcia Gordon on May 15, 2014, the City notified me that it had reached a settlement with the Gordon Defendants, (Doc. 125), and on June 10, 2014, I entered a Consent Order against the Gordon Defendants, (Doc. 127).

Meanwhile, on April 24, 2014, the City filed this Motion against RIL, as well as a supporting memorandum, Rule 56.1 Statement of Material Undisputed Facts, and supporting declarations. (Docs.111–15.) On June 9, 2014, RIL's counsel filed a motion to withdraw from the case because RIL had advised him that it had no money and could not pay its outstanding legal fees. (*See* Docs. 124, 132.) The City and counsel for RIL appeared before me on June 20, 2014 to discuss the motion to withdraw. On June 23, 2014, I granted the motion to withdraw, allowed RIL thirty additional days to oppose the City's Motion for Summary Judgment, and scheduled a teleconference for July 24, 2014 to discuss RIL's intentions. (Doc. 132.) RIL did not attend the teleconference and no notice of appearance was filed.

Accordingly, I entered an Order for RIL to show cause why the City's Motion should not be deemed fully submitted and unopposed. (Doc. 133.) The City appeared for the show cause hearing on August 29, 2014, but RIL did not. Thereafter, the City filed a letter stating that settlement talks with RIL were unsuccessful and that RIL did not plan to file an opposition. (Doc. 134.) On January 13, 2015 the City filed a letter notifying me of a settlement in a related case, and affirming its position that this settlement and the settlement with the Gordon Defendants did not affect the damages to be assessed against RIL in this case. (Doc. 135.)

### III. *Legal Standard*

A party moving for summary judgment must submit a statement of material facts deemed to be undisputed. Fed.R.Civ.P. 56(c); S.D.N.Y. Local R. 56.1. The statement of facts must reference admissible evidence in the record tending to prove each such fact. Fed.R.Civ.P. 56(c)(1). While the non-moving party is not required to respond to a motion for summary judgment, if it does not respond the non-moving party risks the movant's statement of facts being deemed admitted. *Jackson v. Fed. Express,* 766 F.3d 189, 194 (2d Cir.2014) (citing Fed.R.Civ.P. 56(e)(2)). However, a non-response is not a default. *Id.* Instead, "[b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Id.* "Even unopposed motions for summary judgment must 'fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law.'" *D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95, 110 (2d Cir.2006) (quoting *Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004)). "And, of course,

the court must determine whether the legal theory of the motion is sound." *Jackson,* 766 F.3d at 194. A district court is required to examine the record and legal theories in greater detail when the non-moving party is unrepresented. *See id.* at 196–97.

Here, as explained above, RIL did not submit a response to the City's Motion; therefore, I consider the Motion unopposed. Although RIL was initially represented by counsel, its counsel withdrew, so it appears that RIL was acting without counsel in choosing not to respond to the Motion. Accordingly, I have examined the legal theories underlying the City's Motion and I have reviewed the materials submitted by the City to determine whether the City's 56.1 statement is supported by admissible evidence. I conclude that the facts discussed below are supported by admissible evidence in the record.

## IV. *Legal Discussion*

### A. *Law of the Case*

"The law of the case doctrine, although not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons, including, *inter alia,* the need to correct a clear error or prevent manifest injustice." *In re Peters,* 642 F.3d 381, 386 (2d Cir.2011). The doctrine continues to apply even where a case has been reassigned to a new judge. *Dandong v. Pinnacle Performance Ltd.,* 966 F.Supp.2d 374, 385 (S.D.N.Y.2013); *Laurent v. PriceWaterhouseCoopers LLP,* 963 F.Supp.2d 310, 314 (S.D.N.Y.2013). However, the doctrine "does not rigidly bind a court to its former decisions, but is only addressed to its good sense." *Johnson v. Holder,* 564 F.3d 95, 99 (2d Cir. 2009). It is particularly flexible where the prior decision was made on a preliminary injunction motion because "[a] preliminary

determination of likelihood of success on the merits ... is ordinarily tentative, pending a trial or motion for summary judgment." *Goodheart Clothing Co. v. Laura Goodman Enters., Inc.,* 962 F.2d 268, 274 (2d Cir.1992).

Here, Judge Furman ruled on many of the legal issues presented by this Motion when he granted the City a preliminary injunction and denied RIL's motion to dismiss. *See generally Gordon,* 1 F.Supp.3d at 98. Those legal rulings are entitled to a certain amount of deference, although their proper weight is complicated by the fact that Judge Furman was addressing both a motion for a preliminary injunction and a motion to dismiss. As a result, I give little if any weight to any factual determinations or inferences in that decision, or to the application of law to facts. However, I give deference to legal conclusions, e.g., issues of statutory construction. While preliminary factual determinations must be revisited against a more complete record, good sense dictates that a court interpret the same statute in the same way throughout a litigation, unless there is an intervening change in the law, *see Cal. Fed. Bank v. United States,* 395 F.3d 1263, 1274–75 (Fed.Cir.2005) (declining to revisit determination of statutory construction where intervening decision did not counsel a different outcome), or unless an earlier interpretation was clearly an error, *see Peters,* 642 F.3d at 386.

### B. *Liability*

#### 1. CCTA

The City contends that RIL violated the CCTA by knowingly transporting unstamped cigarettes. The CCTA provides, in relevant part, that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes...." 18

U.S.C. § 2342(a). "Contraband cigarettes" are defined as

a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp . . . and which are in the possession of any person other than . . . (B) a common or contract carrier transporting the cigarettes involved under a proper bill of lading or freight bill. . . .

■ *Id.* § 2341(2). To prevail, the City must show that RIL (1) knowingly shipped, transported, received, possessed, sold, distributed or purchased (2) more than 10,000 cigarettes (3) that did not bear State or City tax stamps, (4) under circumstances where the law required the cigarettes to bear such stamps. *City of New York v. LaserShip, Inc.,* 33 F.Supp.3d 303, 312 (S.D.N.Y.2014) (quoting *City of New York v. Golden Feather Smoke Shop, Inc.,* No. 08–CV–3966, 2009 WL 2612345, at *11 (E.D.N.Y. Aug. 25, 2009)); *accord United States v. Khan,* 771 F.3d 367, 378 (7th Cir.2014).

The facts described below, which are supported by record evidence, satisfy the City's burden of production as to each element of the CCTA claim.

**a.** *Knowingly Shipped or Distributed*

■ RIL was not required to know specifically that the cigarettes it distributed violated state and local tax law. The Second Circuit has found "meritless" the contention "that a valid conviction under the CCTA require[s] the government to show that [the defendant] had knowledge that he was selling 'contraband' cigarettes."

*United States v. Morrison,* 686 F.3d 94, 107–08 (2d Cir.2012); *see also City of New York v. Milhelm Attea & Bros., Inc.,* No. 06–CV–3620, 2012 WL 3579568, at *25 (E.D.N.Y. Aug. 17, 2012) (collecting cases, including from outside of this Circuit). Instead, this element is satisfied if RIL knew that it was distributing a sufficient quantity of cigarettes for which no tax had been collected. *See United States v. Elshenawy,* 801 F.2d 856, 857–59 (6th Cir.1986) (violation only requires that defendant "knew the physical nature of what he possessed, 'a quantity in excess of [1]0,000 cigarettes which bore no evidence of the payment of applicable state cigarette taxes' ") (alteration omitted).

■ RIL argued in opposition to the motion for preliminary injunction and in support of its motion to dismiss that its actions were not knowing because it did not pack the packages of cigarettes and because it was not aware of the exact contents of the packages except as informed by the shippers. *See Gordon,* 1 F.Supp.3d at 107. This argument is undermined by the record because there is evidence indicating that RIL knew it was shipping unstamped cigarettes.

Michael Hale was RIL's Vice President in charge of sales. (Hale Dep. 8–10.) He testified at his deposition that RIL began shipping cigarettes for SNI smoke shops because the smoke shops could no longer use the Postal Service for such shipments. (*Id.* at 41.) He testified that he understood that this was because "the Native Americans weren't willing to collect or pay taxes on the cigarettes." (*Id.* at 43; *see id.* at 104–05.) RIL created a "division" called Regional Parcel Services ("RPS")[10] specifically for its SNI customers, (*id.* at

---

**10.** Because RPS was denominated a division by RIL but had no separate legal existence apart from RIL, (*see* Hale Dep. at 12–14, 19–21), I refer to the two entities interchange-

ably. In particular, although the vast majority of RIL's cigarette-shipping business was conducted under the name of RPS, I typically refer to the actions as taken by RIL.

13–14, 19–21), because it was concerned about the "legalities of whether or not it was okay for [RIL] to transport native brand or smoke shop cigarettes from one point to another," (*id.* at 24).

At around the same time, the Gordon Defendants, one of RIL's SNI customers, announced on their public website that they were able to offer lower prices than competitors because they did not pay or collect taxes on cigarette sales. (Doc. 155–5.) Another RIL customer, Indian Smokes, wrote to RIL's customer service email account in April 2011 complaining that its shipment of "9 cartons of untaxed black market cigarettes [were] unaccounted for." (Doc. 115–29 at 1.) In an internal RIL email about this issue, Hale wrote that he "would rather [not] put anything into writing" and that the customer was unlikely to report the problem because it "will only result in her being audited … for the proper payment of taxes, which she owes." (Doc. 115–30.) The SNI customer from whom RIL received the most packages, Red Earth, (Hale Dep. 117–18), admitted that its "business model is predicated upon soliciting sales and engaging in transactions for the purchase of cigarettes free of New York State sales taxes," (Doc. 115–3 ¶ 5).

Finally, RIL tailored its business model to target jurisdictions with high cigarette taxes. As Hale explained at his deposition, "what we realized being a for-profit-business, was that [a smoke shop's] customer list would correspond directly to the states that had high tax rates than other states." (Hale Dep. 70.)

From this evidence a reasonable jury certainly could conclude that RIL knew it was shipping cigarettes on which no tax had been paid.

### b. *10,000 Cigarettes*

Judge Furman previously concluded that CCTA's 10,000–cigarette requirement need not be met in any single transaction. *See Gordon,* 1 F.Supp.3d at 103–05. Notably, the text of § 2341(2) contains no per-transaction limitation, while other provisions of the CCTA do contain such limitations, *see, e.g.,* 18 U.S.C. §§ 2343(a), (b). There is no need to revisit Judge Furman's interpretation of the CCTA. *See LaserShip,* 33 F.Supp.3d at 313 (reaching same conclusion); *see also New York v. United Parcel Serv., Inc.,* 131 F.Supp.3d 132, 139, 2015 WL 5474067, at *6 (S.D.N.Y. 2015) (noting that "every court in this district to have taken up the question" has found that "the plain language of the CCTA … imposes no single transaction requirement").

In submissions related to previous motions, the Gordon Defendants admitted to selling more than 10,000 cigarettes to New York City residents in May 2012, and RIL did not contest that it transported those cigarettes. *See Gordon,* 1 F.Supp.3d at 102. Specifically, the Gordon Defendants admitted that they shipped 406 packages with RIL in May 2012, (Doc. 115–20 ¶ 4). A carton contains 200 cigarettes, so fifty cartons contain 10,000 cigarettes. *See Gordon,* 1 F.Supp.3d at 102. Even assuming each package had only one carton of cigarettes, the shipments that month contained at least 81,200 cigarettes. RIL typically used two different box types to ship cigarettes: a smaller box capable of holding up to six cartons of cigarettes, and a larger box capable of holding up to twelve cartons. (Hale Dep. 205–07.) Thus, the actual count of cigarettes shipped in May 2012 likely was between 487,200 and 974,-400 cigarettes. In addition, the evidence suggests that shipments of this quantity were not unusual for RIL. For example, a single invoice, from September 24, 2012, between RIL and the intermediate carrier that delivered the packages to the courier that made final deliveries within New York City, (Hale Dep. 184–85, 213–17), lists 104 boxes being shipped, (Doc. 115–16). As a

result, based upon these figures, the total amount shipped that day was far more than 10,000 cigarettes.

### c. Unstamped

Based on the same evidence from which it could conclude that RIL knowingly shipped untaxed cigarettes, a reasonable jury could conclude that those cigarettes were in fact unstamped.

### d. Stamps Were Required

■■■ The State imposes "a tax on all cigarettes possessed in the state by any person for sale," N.Y. Tax L. § 471(1), and on "all cigarettes used in the state by any person," *id.* § 471–A. There is an exemption where the State "is without power to impose such tax, including sales to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation." *Id.* §§ 471(1), 471–A. The exemption does not apply here.[11] The City imposes a tax on "[a]ll cigarettes possessed in the city for sale" and on "[t]he use of all cigarettes in the city." N.Y.C. Admin. Code §§ 11–1302(a)(1), (2). It is undisputed in this case that these taxes were in effect during the years that RIL was in the business of shipping cigarettes for SNI smoke shops.

### e. Common Carrier Liability

Section 2341(2)(B) of the CCTA defines as non-contraband cigarettes that are in the possession of "a common or contract carrier transporting the cigarettes involved under a proper bill of lading or freight bill which states the quantity, source, and destination of such cigarettes...." RIL took the position on the previous motions that it is afforded a safe harbor under that provision. Judge Furman, however, concluded that "[t]he obvious purpose of this provision is to allow for the possession of unstamped cigarettes by participants in the supply and distribution chain by which cigarettes move from their place of manufacture to stamping agents in a particular state." *Gordon,* 1 F.Supp.3d at 105–06 (citing S.Rep. No. 95–962). His conclusion found support in other decisions addressing the question, *see id.* at 106 (collecting cases), and the only subsequent decision of which I am aware reached the same result. *LaserShip,* 33 F.Supp.3d at 313–15. I see no reason to depart from Judge Furman's statutory interpretation. The unstamped cigarettes therefore did not become non-contraband in RIL's possession.

### f. Conclusion

Based upon my review of the evidence submitted by the City, I find that it has presented sufficient evidence for a reasonable jury to find, and I therefore conclude, that RIL violated the CCTA.

### 2. RICO

■■■ The City contends that RIL violated RICO by carrying on multiple enter-

11. The State tax applies to "all cigarettes sold on an Indian reservation to non-members of the Indian nation." N.Y. Tax L. § 471(1). More generally, "[w]hile federal tax law prohibits taxing cigarettes sold by Native Americans to other tribal members from the same reservation, states can impose taxes upon the sale of cigarettes to non-reservation consumers provided the taxing scheme is not unduly burdensome." *City of New York v. Golden Feather Smoke Shop, Inc.,* 597 F.3d 115, 122 (2d Cir.2010) (internal citation omitted). Although the State does not enforce its cigarette tax laws with respect "to on-reservation sales to Indians for their personal use[,] there is no exemption allowing Indians to engage in the wholesale distribution of untaxed cigarettes destined for off-reservation sales." *See Cayuga Indian Nation of N.Y. v. Gould,* 14 N.Y.3d 614, 653, 904 N.Y.S.2d 312, 930 N.E.2d 233 (2010). Large-scale off-reservation sales as implicated here remain properly the basis of a criminal prosecution under the CCTA. *See Morrison,* 686 F.3d at 105–07; *Gould,* 14 N.Y.3d at 652, 904 N.Y.S.2d 312, 930 N.E.2d 233 ("large-scale cigarette bootlegging activities engaged in by Indian and non-Indian traders" subject to prosecution).

prises dedicated to transporting unstamped cigarettes. To establish a civil RICO violation, a plaintiff must demonstrate: (1) an underlying violation of the RICO statute; (2) an injury to business or property; and (3) that the injury was caused by the underlying violation. *DeFalco v. Bernas,* 244 F.3d 286, 305 (2d Cir.2001).

### a. *Underlying RICO Violation*

The RICO statute provides in relevant part that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Proof of such a violation requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco,* 244 F.3d at 306 (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). The statute defines "enterprise" to include "any ... association ... or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States,* 556 U.S. 938, 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). "Such a group need not have a hierarchical structure or a 'chain of command,'" its members need not have defined roles, and it need not engage in diverse or unique crimes. *Id.*

### i. *Conducting an Enterprise*

For purposes of the motion to dismiss, Judge Furman concluded that the City had adequately alleged an association-in-fact among RIL and the Gordon Defen-

dants. *See Gordon,* 1 F.Supp.3d at 111. The existence of that enterprise was essentially undisputed by the parties, *see id.* at 102 (Gordon Defendants conceded that they were shipping unstamped cigarettes, and RIL did not contest that it was the carrier), and is corroborated by evidence subsequently put into the record, including that the parties entered into a service agreement and a mutual nondisclosure agreement, (Doc. 115–10), and that a City fraud investigator who ordered cigarettes from the Gordon Defendants was required to complete a delivery release authorization from RPS, (Doc. 115–19 ¶ 5 & Ex. B). A jury thus could find that the Gordon Defendants and RIL worked together to ship unstamped cigarettes.

In addition, the record also supports finding that RIL was engaged in similar enterprises with other smoke shops. Around the time that RIL began providing shipping services to SNI smoke shops, it made a presentation to an SNI trade group to advise the members that RIL's services were available as an alternative to the Postal Service. (Hale Dep. 40, 60.) Two representatives of one of the smoke shops, Wolfpack Tobacco, confirmed that RIL approached their smoke shop about doing business. (*See* Doc. 115–4 at 8.) In an email dated December 20, 2010, Hale explained to one of these representatives how the companies would need to work together in order to ensure that packages were delivered, and concluded his email stating: "This is supposed to be a partnership. We PROMISED to work with your company to find a solution to the mail order business." (Doc. 115–8.) Hale wrote to a representative of another smoke shop in September 2011, again explaining how the companies needed to collaborate, and stating: "We are working together with all of the smoke shops to [ship cigarettes]." (Doc. 115–44.) Hale met with smoke shops in one-on-one meetings to

identify and solve problems related to making residential deliveries of cigarettes. (Hale Dep. 40.) Finally, RIL entered into service agreements and non-disclosure agreements with all of the smoke shops for which it provided shipping services. (*Id.* at 55, 68.)

The evidence supports a finding that RIL was more than just a passive partner in these enterprises. To the contrary, RIL became an integral participant in the organizing and planning of shipments. RIL's original role was to serve as a warehouse repository used by another company. (Hale Dep. 26–31.) Within a few months, however, Hale concluded that RIL could provide shipment services more effectively, and thus derive a greater profit, and therefore became involved in other aspects of the process. (Hale Dep. 31–33, 36.) Beginning in August 2010, RIL began to take over from the other company various aspects of the distribution process, including contracting intermediate carriers and final-delivery couriers. (Hale Dep. 38–39.) At around the same time, RIL formed RPS to handle deliveries for smoke shops. (Hale Dep. 12–14, 19–21.) By February 2011, RIL had completely replaced the other company as the shipper of choice for SNI smoke shops. (Hale Dep. 38–41.)

RIL was substantially integrated into the SNI's delivery of contraband cigarettes. Twice a week, it picked up packages from the smoke shops on the SNI reservation. (Hale Dep. 36–37, 184, 187–88.) At its warehouse, it sorted the packages by zip code and grouped the packages according to which final courier would be making the delivery. (*Id.* at 184.) RIL then shipped the packages via intermediate carriers to the final couriers, (*id.* at 184–85), and continued to track the packages through delivery, (*see id.* at 204–05).

Hale testified that he personally did the work necessary to set up this distribution network. (*Id.* at 155–56.) In his words, RIL "developed a plan to grow the business to provide as many zip code coverage areas as [it] could while providing the [smoke shops] with a fixed cost per piece." (*Id.* at 45.) The ability of the smoke shops to sell to individual zip codes was dependent on RIL's ability to find couriers that serviced those zip codes. (*See id.* at 48–49.) RIL's strategy in expanding its delivery coverage for smoke shops was to target states with high cigarette taxes. (*Id.* at 70.)

Based on this evidence, a jury could conclude that RIL was conducting several enterprises.

### ii. *Pattern of Racketeering*

█ Racketeering activity includes "any act which is indictable" under various provisions of Title 18 of the United States Code, including the CCTA. 18 U.S.C. § 1961(1). As explained above, RIL engaged in activity that is indictable under Section 2342(a). A "pattern of racketeering activity requires at least two acts of racketeering activity, ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity...." 18 U.S.C. § 1961(5). To demonstrate a sufficient pattern, a plaintiff generally must show either that the predicate acts occurred "over a substantial period of time," typically understood to encompass no less than two years, or that the enterprise poses "a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir.2008). The former is referred to as close-ended continuity, and the latter as open-ended continuity. *See H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

■ The record evidence supports both close-ended and open-ended continuity. In discovery, RIL produced 243 computer files listing deliveries to City addresses, dated between January 7, 2011 and May 24, 2013. (Doc. 114–1.) RIL delivered roughly 440 packages of cigarettes to the City in January 2011, (Doc. 114–3 at 2–9), and roughly 520 packages of cigarettes to the City in May 2013, (*id.* at 325–33). The packages were designed to hold multiple cartons of cigarettes, (Hale Dep. 205–07), but even assuming one carton of cigarettes was sent in each package, RIL shipped enough cigarettes in January 2011 and in May 2013 to violate the CCTA many times over. Such evidence more than supports a finding of the existence of close-ended continuity: multiple predicate violations occurring more than two years apart and continuing in the interim.

■ In addition, the evidence supports close-ended continuity. The threat of future conduct for this purpose is evaluated at the time the conduct was committed. *See United States v. Aulicino,* 44 F.3d 1102, 1111 (2d Cir.1995). A threat of future activity is only extinguished as a matter of law where the conduct has an "inherently terminable" goal. *DeFalco,* 244 F.3d at 324. Involuntary cessation does not undermine open-ended continuity. *Id.* I have already described the predicate acts. The evidence supports a threat of future activity because there is no evidence in the record that RIL had plans to discontinue shipping cigarettes for the SNI smoke shops; instead, RIL did so only when enjoined by this Court. (*See* Hale Dep. 16, 174.)

### b. *Injury*

■ The City alleges that RIL's racketeering activity deprived it of cigarette tax revenue. "[L]ost taxes can constitute injury to 'business or property' for purposes of RICO. . . ." *City of New York v. Smokes–Spirits.com, Inc.,* 541 F.3d 425, 445 (2d Cir.2008), *rev'd on other grounds sub nom Hemi Group, LLC v. City of New York,* 559 U.S. 1, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010); *see also Pasquantino v. United States,* 544 U.S. 349, 355–56, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005). The City requires tax to be paid on all cigarettes possessed or used in the City. N.Y.C. Admin. Code §§ 11–1302(a)(1), (2). RIL's business with the smoke shops was the shipping of unstamped or untaxed cigarettes, including to the City. Accordingly, the City has satisfied this element.

### c. *Causation*

■ "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Group,* 559 U.S. at 9, 130 S.Ct. 983. This standard requires "some direct relation between the injury asserted and the injurious conduct alleged"; "[a] link that is too remote, purely contingent, or indirect is insufficient." *Id.* (alteration omitted). In *Hemi Group,* the City asserted RICO claims against a New Mexico company that was selling cigarettes online. *Id.* at 5–6, 130 S.Ct. 983. The City argued that the company committed the predicate act of wire fraud by failing to file with the State of New York certain required reports of interstate cigarette sales. *See id.* at 6–7, 9, 130 S.Ct. 983. The Supreme Court held that the causal connection between the fraud and the City's lost tax revenue was too attenuated and relied on too many intermediate steps to support a RICO claim. *See id.* at 17–18, 130 S.Ct. 983.

■ Here, however, the injury and the injurious conduct are directly connected. RIL was part of various enterprises whose object was to ship untaxed cigarettes, in

violation of the CCTA. Certain of those shipments were made to the City, which lost tax revenue as a result. Accordingly, this case is not like *Hemi Group*, in which multiple steps separated the challenged conduct and the resulting injury, *see id.* at 9, 130 S.Ct. 983. The scheme in which RIL was engaged was designed to cause the very injury the City suffered; indeed the profit RIL derived from its participation was linked to the avoidance of paying taxes. Courts in this Circuit have reached the same conclusion in discussing similar predicate acts in violation of the CCTA. *See LaserShip*, 33 F.Supp.3d at 312 (finding that the City's alleged loss of tax revenue was "directly linked to the predicate acts charged"—the "evasion of the New York tax collection scheme by delivering untaxed cigarettes"; in other words, "[t]he selling, shipping, and transporting of unstamped cigarettes was a direct cause of the tax evasion that injured the City"); *City of New York v. Chavez*, No. 11–CV–2691, 2012 WL 1022283, at *7 & n. 6 (S.D.N.Y. Mar. 26, 2012) (distinguishing *Hemi Group*, observing that "[t]he Complaint characterizes the City's harm as a loss of tax revenue ... [and] [t]he conduct alleged to establish the predicate acts is the Defendant[s'] evasion of the New York tax collection scheme. As such, the conduct causing the harm is the same conduct that creates liability for the predicate act").

### d. Conclusion

The City produced sufficient evidence for a reasonable jury to find, and I thus conclude, that RIL violated RICO.

### C. Damages

"[C]ourts ... routinely award damages that are readily calculable based on the undisputed facts on summary judgment," *AEP Energy Servs. Gas Holding Co. v*

*Bank of Am., N.A.*, 626 F.3d 699, 740 (2d Cir.2010); *see also Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 192 (2d Cir.2006), as long as there was sufficient notice to the non-moving party that damages were being sought, *see Schwan–Stabilo Cosmetics GmbH & Co. v. Pacificlink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir.2005). Here, the City's Motion specifically requests damages, (*see* Doc. 112 at 30–35), so an award of damages is appropriate if the City has carried its burden of producing sufficient admissible evidence from which damages can be calculated, *Jackson*, 766 F.3d at 194.

The City attempts to demonstrate damages in the form of lost taxes as follows. First, during the relevant time period, it imposed a $15 tax on a carton of cigarettes. *See* N.Y.C. Admin. Code § 11–1302(a)(3) (seventy-five-cent tax on every ten cigarettes).

Second, Hale testified that until February 2011, RIL used two companies, called TXX and Velocity Express, as the "last-mile" or final-destination courier for smoke-shop deliveries made within the City. (Hale Dep. 154–55.) After that time, another company, called LaserShip, Inc. ("LaserShip"), was RIL's final-destination courier for deliveries to the City. (*Id.* at 155.) Hale testified that RIL sent Advance Ship Notice ("ASN") files to these couriers for each delivery. (*Id.* at 194–98.) The ASN files included information identifying which of RIL's smoke shop customers the delivery originated with, as well as the address and zip code for the final delivery, the weight of the shipment, the number of boxes for the shipment, and whether the boxes were large or small. (*Id.* at 200–01.) The delivery information was entered by the smoke shops at the time of sale into a database maintained by RIL. (*Id.* at 188–90, 196–97.)

█ Third, the City received 243 ASN files in discovery that it was able to identify with either LaserShip or Velocity.[12] (Doc. 114 ¶¶ 3–4; Doc. 114–1.) The files are dated between January 27, 2011 and May 24, 2013. (Doc. 114–1.) ASN files were housed by RIL in a spreadsheet format. (Hale Dep. 195.) The City used the 243 ASN files to create a single spreadsheet,[13] (Doc. 114–3), including only delivery entries to one of over 300 zip codes that the City claims are within the City's borders. (Doc. 114 ¶¶ 5, 7, 10; Doc. 114–2.) The City then estimated the number of cartons sold to locations within the City based on the weight of the packages and RIL's standardized package sizes, (*see* Doc. 113 at 34 & n. 19; Hale Dep. 205–07), and on testimony from a Wolfpack Tobacco representative concerning the percentage of its sales to the City that were cigarettes, (*see* Doc. 113 at 34–35; *see generally* Doc. 115–7, Doc. 115–60).

█ What the City has failed to provide is any admissible evidence that its list of City zip codes is accurate. Instead, the genesis of the list is explained only by the statement that one of the City's attorneys "provided" the list to the City's computer aide and represented that it was a "list of zip codes in New York City." (Doc. 114 ¶ 5.) Nothing else in the record, including the list itself, (Doc. 114–2), provides any further information explaining how the list was compiled. While zip codes can be the subject of judicial notice under Federal

Rule of Evidence 201, *see, e.g., Ahn v. Inkwell Pub. Solutions, Inc.,* No. 10–CV–8726, 2013 WL 3055793, at *4 (S.D.N.Y. June 19, 2013), my attempts to reverse-engineer the City's list using the U.S. Postal Service's website, *https://tools.usps.com/go/ZipLookupAction!input.action?mode=2 & refresh=true,* were unsuccessful.[14] This list is critical to the City's calculation of damages since the City only lost taxes on cigarettes used or possessed in the City, *see* N.Y.C. Admin. Code § 11–1302. Without a proper foundation for the assertion that these zip codes are relevant, however, the list is inadmissible and unreliable.

Accordingly, damages cannot be determined on the papers before me.

## V. *Conclusion*

For the foregoing reasons, Plaintiff's Motion for Summary Judgment, (Doc. 111), is GRANTED as to liability and DENIED as to damages.

I refer the issue of damages to Magistrate Judge Pitman. Plaintiff is directed to submit to Judge Pitman any additional papers concerning damages no later than thirty days following this Memorandum and Order, or as Judge Pitman directs. These papers should include a single copy of all 243 ASN files on which Plaintiff relies, and whatever other information Magistrate Judge Pitman requires.

---

12. The ASN files are admissible as business records of RIL, under Federal Rule of Evidence 803(6). Hale's testimony establishes that were updated contemporaneously by the smoke shops, which were knowledgeable as to the delivery information, and were kept in the regular course of RIL's business. (Hale Dep. 188–201.)

13. The resulting spreadsheet is admissible as a summary to prove content under Federal Rule of Evidence 1006 because the ASN files

on which it is based are otherwise admissible, *see BD ex rel. Jean Doe v. DeBuono,* 193 F.R.D. 117, 129 (S.D.N.Y.2000), and because the Declaration of Andrew Wu, (Doc. 114), sufficiently details the steps used to make that spreadsheet.

14. Moreover, the City's list includes certain zip codes that, according to the U.S. Postal Services' website, are not valid zip codes.

The Clerk's Office is respectfully directed to terminate Doc. 111.

SO ORDERED.